**UNITED STATES**

v.

**Senior Airman Donald F. BINDLEY, Jr., FR 544–88–0409 United States Air Force.**

**ACM 25401.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 25 April 1986.

Decided 6 Nov. 1986.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Lieutenant Colonel Michael D. Wims.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Captain Marc Van Nuys.

Before FORAY, MICHALSKI and MURDOCK, Appellate Military Judges.

DECISION

MURDOCK, Judge:

A military judge, sitting alone as a general court-martial, convicted the appellant of desertion. The military judge accepted the appellant's plea of guilty to the lesser included offense of absence without

leave, so the only issue for the trial on the merits was whether the appellant intended to remain away permanently. The appellant asserts that the military judge erred by allowing a police detective to state his opinion of the appellant's intention to remain away permanently. We disagree.

After about five years of good service, the appellant's personal situation began to crumble. Over the next year, he found it increasingly difficult to ignore the consequences of his alcoholism. His record deteriorated. In that year, he received nonjudicial punishment for drunk driving, a letter of reprimand for failing to go to an official duty, was failing on the weight control program, and was bouncing checks. Off base, he was convicted for failing to remain at the scene of an accident. Finally, he attempted to commit suicide by taking a large dose of Advil. When he was released from the hospital, he was granted a 45 day leave to go home and "relax".

Three days before his leave was due to expire, his father took him to the airport to return to his assignment at Minot Air Force Base, North Dakota. His route required him to change planes in Seattle. Rather than do this, he spent five days with friends in Washington. When he finally arrived in the Minot area he was two days overdue. He picked up his car and, after partying with friends in town, drove to Des Moines, Iowa. From there he travelled back and forth across the eastern half of the country in an area roughly bounded by Louisiana, Florida, Pennsylvania, and Wisconsin. He finally came to rest in a St. Louis, Missouri motel room. While he was registered at the motel, he cashed several checks on a closed account. The motel staff called the police. Before the police came to arrest him, they ran his name through the National Crime Information Center and discovered he was wanted by the Air Force for desertion.

The detective who made the arrest testified at the court-martial. His testimony forms the basis of the appellant's assertion of error. To understand the error and its resolution we must quote extensively from the trial counsel's examination of the detective.

Q: When you asked him about the desertion charge, did you ever ask him whether he intended to return to Minot Air Force Base?

A: Yes, sir. I—he told me that he had left the Air Force.

Q: Okay, and he had left, but did you ask him if he intended to return, and did he respond to that?

A: Yes, sir. He was not going to return.

Q: He told you that?

A: Yes, sir.

Q: Did you ask him, or did the conversation then progress anything as to what his doings were in St. Louis?

A: Yes, sir, he told me he had traveled across the country into several states, and he had decided that, based upon some information that he had received in Indianapolis, Indiana, he was going to settle down, find a job in St. Louis, and live there.

Q: Now at a later time, Airman Bindly, the accused in this case, had wrote a statement to you. Is that correct?

A: Yes, sir, it is.

. . .

Q: In that statement he indicated that the only reason I came here was to settle down. Is that correct?

A: Yes, sir.

Q: Was that, when he indicated that in the statement, did you try to clarify that at all?

A: We talked about it before the statement was written, and we talked about it after it was written also.

Q: Can you tell the court what the conversations were in regard to that particular statement, that the only reason I came here was to settle down?

A: He stated that he wanted, he was looking for, a place to live, and he liked the area and the people around St. Louis, and he wanted to find a job and stay there.

Q: Did you ask him any questions about how he felt he would get away with it,

having the Air Force not find him or anything along those lines?

A: He believed that after a time the Air Force would just quit looking for him, that it would just, it would go away.

Q: He told you that?

A: Yes, sir.

...

After the detective testified that he informed the appellant that the punishment for a bad check offense in Missouri would probably be six months in jail, the trial counsel asked what the appellant's response had been. The detective stated:

A: Basically, that it was better serving six months in St. Louis County than coming back to Minot, North Dakota.

The trial counsel then turned to questions concerning the detective's experience.

Q: Now in your sixteen years in experience in the St. Louis County Police Department, you've had occasion to arrest transients coming through?

A: Yes, sir, I have.

Q: You've had occasion to make arrests upon military members that were AWOL or deserting?

A: Yes, sir, I have.

Q: Do you know the basic distinction between that, someone that's AWOL and someone that's ...

A: Yes, sir, I do know the distinction.

Q: Based on your experience as the arresting individual such as people AWOL and people deserting, in your opinion, what was Airman Bindley's status.

A: In my opinion, he had no intention whatsoever of coming back.

At that point, the defense counsel objected, stating that a proper foundation had not been laid for the detective to "testify as an expert to speculate on what the intentions of other people are". As part of his deliberation on the motion, the military judge questioned the detective. After learning that the detective knew the difference between AWOL and desertion, and that he had apprehended between 25 and 30 military absentees in his career, the military judge asked the following questions.

Q: Now let me ask you some questions about this particular accused. Is there anything else that, other than what trial counsel has already brought out, that indicated to you that this particular accused was not going to return to the military voluntarily?

A: Yes, sir, there was.

Q: What were those?

A: He related to me that he had some personal problems and a drinking problem at Minot and that he had lost a rank and that he did not feel the Air Force was taking care of his needs whatsoever and had sent him on leave instead of caring for him better and that he had figured they just didn't care about him anymore.

Following this exchange, the military judge overruled the objection.

The appellant now asserts it was error to allow the detective to testify "as an expert on the appellant's intent". This assertion misconstrues the nature of the testimony. Unlike the situations in *United States v. Cameron*, 21 M.J. 59 (C.M.A.1985) and *United States v. Wagner*, 20 M.J. 758 (A.F. C.M.R.1985), this case does not involve "human lie-detector" testimony. Instead, we have an experienced and knowledgeable policeman explaining the conclusions he drew from specific statements and actions of the appellant.

■ Laymen may testify to "those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the testimony of the witness of the determination of a fact in issue." Mil.R.Evid. 701. Further, "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact". Mil.R.Evid. 704. The detective did use the word "intention" in his testimony, but the tenor of his remarks was not that legal intent to stay away existed. Rather, his remarks appear to have been an explanation of the inferences he drew from the

appellant's statements and actions. Determination of the existence of legal intent in this judge alone court-martial remained with the military judge. R.C.M. 922. The military judge is presumed to know the law and apply it correctly. *United States v. Montgomery*, 20 U.S.C.M.A. 35, 42 C.M.R. 227 (1970). Nothing in the record indicates that the judge abandoned his fact-finding role on the basis of the detective's testimony.

We have reviewed the entire record of trial, the assignment of error, and the government's reply thereto and concluded that no error materially prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

Senior Judge FORAY and Judge MICHALSKI concur.