Justice Marshall,
with whom
Justice Brennan and Justice Blackmun join, dissenting.
In Strickland v. Washington, 466 U. S. 668 (1984), this Court held that the Sixth Amendment’s promise of effective assistance of counsel is not breached unless the criminal defendant can show that his attorney’s conduct fell beyond the bounds of professional competence and thereby prejudiced his defense. Id., at 687. Since Strickland was decided, the Court has never identified an instance of attorney dereliction that met its stringent standard. Most recently, this Court rejected a claim that inadequate investigation of mitigating circumstances constituted ineffective assistance of counsel in a capital case. See Burger v. Kemp, ante, p. 776. Lest we permit the lower courts to conclude that the Sixth Amendment guarantees no more than that “a person who happens to be a lawyer is present at trial alongside the accused”— a notion expressly disavowed in Strickland, supra, at 685—the Court should now give life to the Strickland standard. Accordingly, I would grant certiorari to consider the substantial allegation that counsel’s performance, before the tribunal that sentenced petitioner to die, fell short of minimally effective representation.
I
On November 5, 1974, petitioner pleaded guilty to the murder of a 14-year-old boy in the course of a convenience-store robbery. At the sentencing proceeding conducted without a jury, the State called five witnesses and introduced documentary evidence in support of its contention that petitioner should receive the death penalty. Defense counsel called no witnesses and presented no. mitigating evidence. The court sentenced petitioner to die. After affirmance of his conviction, petitioner sought a writ of habeas corpus on the ground that he was denied effective assistance of counsel at the sentencing phase of his trial. The District Court *1027 concluded that the “tactical decisions” of petitioner’s counsel were professionally reasonable. Mitchell v. Hopper, 564 F. Supp. 780, 786 (SD Ga. 1983). The Court of Appeals, acknowledging that counsel’s performance raised a “difficult question,” nevertheless affirmed on the ground that it was the result of strategic choices. 762 F. 2d 886, 889-890 (CA11 1985).
The habeas corpus record before the District Court demonstrates that petitioner’s appointed attorney made no attempt to interview any potential mitigating witnesses. 5 Record 21-22. He spoke to no member of petitioner’s family, with the exception of petitioner’s father, with whom he spoke by telephone on two occasions. Counsel apparently initiated these contacts for the purpose of requesting that the family hire an attorney to relieve him of his obligation to represent petitioner. Id., at 23-24. Counsel made no inquiries into his client’s academic, medical, or psychological history.
Nor did counsel pursue a vigorous defense with respect to the circumstances of the crime. He did not interview the police officer who witnessed petitioner’s confession, which the State used to establish the existence of certain aggravating circumstances in support of the death sentence, even though petitioner had told him that the officer — the cousin of the victim — had held a gun to petitioner’s head to extract the confession. Counsel’s reason for not speaking to the officer was that “I personally don’t like the man.” 6 Record 35. Counsel did not interview the sole witness to the crime, who provided the key testimony for the prosecution at sentencing. Id., at 37. He filed no pretrial motions on petitioner’s behalf. Id., at 45.
Counsel’s failure to investigate mitigating circumstances left him ignorant of the abundant information that was available to an attorney exercising minimal diligence in fighting for Billy Mitchell’s life. The affidavits of individuals who would have testified on petitioner’s behalf fill 170 pages of the record in the District Court. Among these potential witnesses are family members, a city councilman, a former prosecutor, a professional football player, a bank vice president, and several teachers, coaches, and friends.
Had defense counsel tapped these resources, he would have been able to present the sentencing judge with a picture of a youth who, despite growing up in “the most poverty-stricken and crime-ridden section of Jacksonville, Florida,” 4 Record 989, had impressed his community as a person of exceptional character. *1028 He had been captain of the football team; leader of the prayer before each game; an above-average student; an active member of the student council, school choir, church choir, glee club, math club, and track team; a Boy Scout; captain of the patrol boys; and an attendant to the junior high school queen.
Examples of the favorable impression that petitioner left on his community abound in the record. One such example is the statement of petitioner’s former teacher and athletic coach at Butler High School:
“To understand what an exceptional person Billy Mitchell was at that time, one must understand that, while a comprehensive high school, Butler at the time was a segregated school in the middle of a very impoverished area — what might be called today a ghetto. In that locale and setting, Billy Mitchell was a rarity because of the exceptional character he displayed at Butler.” Id., at 958-959.
Acquaintances and professionals described petitioner as “the type of person people naturally got along with,” id., at 967; “the kind of person you could depend on for assistance in everything,” id., at 956; “a hard worker who devoted a lot of time to school activities, especially activities involving younger kids,” ibid.; “a fine student and athlete,” id., at 980; a person of “character and personality ... so atypical for someone convicted of a serious crime,” id., at 1001; “not . . . the type of person that should be executed and given no further chance to live out a meaningful life,” id., at 967. Petitioner’s sisters explained that petitioner took care of his 11 brothers and sisters while his mother worked, id., at 953, and that petitioner took a job in the eighth grade to help support his family, id., at 941.
An account of what happened to this well-adjusted young person was also readily available to anyone who took the time to ask. When petitioner was 16 years old, his parents were divorced, and soon thereafter petitioner got into trouble. He and two friends were arrested for attempted robbery. Petitioner professed his innocence, but was persuaded by his father to plead guilty, id., at 948, because “things would go easier for him,” id., at 963. The charges against the two friends were dropped. Petitioner was sentenced to six months in prison, where he was subjected to repeated violent homosexual attacks, experienced severe depression, and lost 30 pounds. Id., at 996-997. When he was re *1029 leased, he continued to be highly depressed, and eventually committed the crime for which he received a sentence of death.
II
Counsel’s explanation for his total lack of preparation for the sentencing hearing is that he carried an “ace in the hole.” 6 Record 43. His sole strategy for representing his client’s interest rested on his belief that, under Georgia law, the State would not be permitted to introduce any evidence of aggravating circumstances of which the defense had not been notified in writing. Prior to sentencing, the State had provided petitioner’s counsel with oral notice of the aggravating circumstances upon which it would rely, but had not furnished written notice. Although the state statute upon which counsel’s theory relied did not mention written notice, and no court decision had ever required that such notice be in writing, counsel was content to rest his entire defense, and the fate of his client, on an untried legal theory. At sentencing, counsel took the first opportunity to object to the admission of aggravating evidence of which he had not received prior written notice; the court promptly overruled his objection, and the “ace in the hole” was gone. Id., at 198. Even if counsel had been correct in his interpretation of state law, of course, the State could have provided the requisite written notice at any time before the hearing, which would have left petitioner equally defenseless.
At the habeas corpus hearing, petitioner’s attorney also claimed that he had not wished to present any mitigating character evidence because that would have opened the door to the State’s introduction of petitioner’s prior conviction. 5 Record 16. Under some circumstances, such a decision might be considered a reasonable strategy. In this case, however, it was patently unreasonable. Counsel conceded, at the habeas proceeding, that he had known nothing of the facts and circumstances of the prior conviction, other than that it was a felony. 6 Record 47. If he had made an inquiry, and if he had acquainted himself at all with what type of mitigating character evidence was available, he might have been in a position to make a professional judgment as to whether the substantial mitigating evidence would be outweighed by the prejudice resulting from the introduction of petitioner’s guilty plea to attempted robbery at the age of 16, the two alleged accomplices to which had been released. Further, he might have decided to *1030 emphasize to the court that the prior conviction was intimately connected to the entire sequence of events that formed a compelling case for mitigation. But no such balancing was made, for counsel had no information to place on either side of the scales. Moreover, under state law, the prior conviction would have been admissible even though the defense put on no evidence. See 762 F. 2d, at 890. If counsel in this case made any decisions at all, they were barren of even minimal supporting information or knowledge.
Counsel’s final excuse for conducting no defense is a vague perception that the client was reluctant to have the attorney probe into his background, for reasons counsel did not know and did not attempt to find out. 6 Record 63. Counsel felt that petitioner, who had finished two years in a junior college, was intelligent and capable of making his own decisions. There is no indication, however, that counsel took any steps to inform his client of the consequences of the various alternatives. Although counsel explained to petitioner his “ace in the hole” strategy for the sentencing hearing, ibid., it is not clear that he warned petitioner that the strategy might fail, or that petitioner stood a good chance of being sentenced to death. Nor is there any indication that the attorney explained the importance of mitigating evidence at a sentencing proceeding, or the potential value of petitioner’s taking the stand himself. Counsel has not alleged that petitioner insisted on any particular line of defense or on any particular conduct by counsel. Rather, he provided no services on behalf of his client because he felt that the client was reluctant to involve his family and friends, perhaps out of a “sense of embarrassment.” Ibid.
Our decisions have recognized that attorneys must have a wide degree of latitude to make strategic decisions on the basis of their knowledge of the law. We have stressed that the judgment of an attorney should not be second-guessed, as long as it falls within the sphere of professional reasonableness. Strickland v. Washington, 466 U. S., at 689. Nevertheless, an attorney’s decision to advance a defense that is wholly unfounded in law, combined with a failure to investigate the merit of accepted and persuasive defenses, cannot be characterized as “sound trial strategy.” See Michel v. Louisiana, 350 U. S. 91, 101 (1955). Indeed, such a decision is not strategic at all; it is incompetent. “The failure of an attorney to inform his client of the relevant law clearly satisfies the first prong of the Strickland analysis . . . .” Hill v. Lockhart, *1031 474 U. S. 52, 62 (1985) (WHITE, J., concurring in judgment). In this case, that failure was aggravated by the additional failure to discover what meritorious defenses were available before rejecting them in favor of a frivolous technical defense. This conduct is professionally unreasonable.
As a result of counsel’s nonfeasance, no one argued to the sentencing judge that petitioner should not die. The judge heard only a technical argument regarding the admissibility of aggravating circumstances without prior written notice, which he consistently rejected, in addition to a reference to petitioner’s youth. These arguments were hardly an effective rebuttal to the testimony of the victim’s mother and the police officers. Prejudice to petitioner’s case is obvious when not even a suggestion that his life had some value, that his crime was aberrational, or that he was suffering from severe depression reached the ears and the conscience of the sentencing judge. See Burger v. Kemp, ante, at 816 (Blackmun, J., dissenting). The judge heard not even a plea for mercy.
Ill
This Court has repeatedly insisted that unfettered consideration of mitigating evidence is an essential aspect of the process by which the States adjudicate the appropriateness of putting a person to death. See, e. g., Sumner v. Shuman, ante, at 76; Eddings v. Oklahoma, 455 U. S. 104, 112 (1982); Lockett v. Ohio, 438 U. S. 586, 605 (1978); Woodson v. North Carolina, 428 U. S. 280, 303 (1976). Accordingly, we have not permitted a State to insulate the capital sentencer from considerations favorable to the defendant. The reliability of the process depends upon the sentencer’s consideration of both tangibles and intangibles, see Caldwell v. Mississippi, 472 U. S. 320, 330 (1985), in evaluating the individual character of the defendant and his acts. In light of the importance that this Court has placed upon the role of mitigating evidence in capital-sentencing decisions, I cannot believe that Strickland was intended to permit a defendant to be sentenced to death solely on the basis of the State’s evidence, when a powerful defense easily could have been marshaled on his behalf. Any reasonable standard of professionalism governing the conduct of a capital defense must impose upon the attorney, at a minimum, the obligation to explore the aspects of his client’s character that might persuade the sentencer to spare his life. Without even this effort by the defense, the adversarial process breaks down.
*1032 By denying certiorari in this compelling case, the Court has refused to apply Strickland in a manner that gives meaning to the constitutional values from which it was derived. I dissent.