**UNITED STATES**

**v.**

**Airman Kirk R. MOSES, FR 494–88–9280, United States Air Force.**

**ACM 26209.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 21 April 1987.

Decided 2 Aug. 1988.

Appellate Counsel for the Appellant: Douglas R. Beach, St. Louis, MO 63105;

David G. Waltrip, St. Louis, MO 63105. Colonel Leo L. Sergi and Major Deborah A. Baker.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Captain Jeffrey H. Curtis.

Before FORAY, MICHALSKI and MURDOCK, Appellate Military Judges.

## DECISION

MURDOCK, Judge:

A general court-martial found the appellant guilty of rape, forcible sodomy, and burglary. The military judge found the burglary charge to be multiplicious with the sex offenses and dismissed it before the sentencing portion of the trial began. The court sentenced the appellant to a dishonorable discharge, 12 years confinement, total forfeitures, and reduction to airman basic. He now alleges two errors. We find no merit in them, but we believe some comment is necessary.

The charges arose from an early morning rape suffered by the victim in her trailer house. The trailer house was in a relatively remote off-base trailer park located about seven miles from the base. The victim began the evening socializing in her unit's dormitory on base. Sometime in the early morning, she left to drive to her trailer. Almost immediately she sensed a car was following her. The car seemed to follow her all the way to her trailer park, despite some efforts on her part to elude the other driver. She hurriedly opened and relocked the gate to her yard area and entered the trailer. Once inside she had a snack, and fed her cat. Before she went to bed she looked outside to see whether the car that had followed her was in sight. Apparently satisfied that she was safe, she locked the door and went to bed. She left the window in the spare bedroom open so her cat could get some air, and closed her bedroom door so the cat would not come into her room.

She was not to get much sleep that night. Before she had fallen asleep, she was alerted by scratching noises near the door to her bedroom. When she looked up she found an intruder at the foot of her bed. There were no lights on in the trailer, but the night was clear and the quarter moon provided enough light to see fairly well.

Using a knife as persuasion, the intruder spent the next fifteen minutes requiring her to perform a variety of sexual acts with him. When he was satisfied, he told her to look the other way for 45 seconds while he dressed and left. While she was looking away she was further terrified when she heard what she thought was a rifle being loaded. She asked if he had a gun and he assured her that all he had was a knife. Then he was gone, as silently as he had arrived. At trial she identified the rifle-like sound as being the same as the sound made by the appellant's knife going into its rigid sheath.

The police investigation revealed that the intruder had probably entered the trailer through the open window in the spare bedroom. The police were not able to find any good fingerprints, but the screen on the window had been slashed. There were no other signs of forced entry.

The appellant now asserts that he was denied effective assistance of counsel because of his counsel's failure to investigate, prepare, and present his defense of alibi. This assertion is based principally on affidavits submitted by two people who were present in the dormitory on the night the crimes were committed. One, Airman Cleland, states that he was with the appellant "off and on" during the evening and early morning hours of the night of the crime. He remembers a party in the dormitory which both he and the appellant attended. He remembers the attendees, including the appellant, coming and going from the room during the evening. About 0100, Cleland and another airman went to the appellant's room where they ate sandwiches. Cleland left about 15 minutes later. From this point, Cleland's affidavit and the one submitted by Krista LaChance, a former airman, are nearly identical. Both affiants state that they were together in the hall

outside the appellant's room from about 0145 until 0500 on the morning of the crime. They both state they could have seen anyone entering or leaving the appellant's room, and that no one did during the time they were there. They state that the only activity around the appellant's door occurred about 0300 when a security policeman knocked on the door. They both remember that no one responded to the policeman's knock.

Both affiants state that they were interviewed by the Air Force Office of Special Investigations (AFOSI). Cleland states he made a written statement, while LaChance states she was interviewed twice, but that she made no written statement to the AFOSI. Cleland states that from the time of his questioning by AFOSI until he was "called to appear at trial by the government counsel, [he] did not have an appointment with or interviews with the any (sic) attorneys for [the appellant]." LaChance states that from the time of her interview with the AFOSI "until this date, I have not been called, interviewed, or had an appointment with any of the attorneys representing [the appellant]."

Government appellate counsel has provided us with affidavits from the trial defense attorneys to help us evaluate this asserted error. Captain Sweetman, Area Defense Counsel at Cannon Air Force Base states:

> I believe that, during the time of preparation, Captain Victorian and myself interviewed all alibi witnesses, including Cleland and LaChance. At approximately 0930 hours on 10 March 1987, I made a note to myself indicating the need to talk to several witnesses, including Cleland. I subsequently checked off these items as being "done". Furthermore, I have notes (undated) of my interview of Airman LaChance, which indicate that she told me she had not seen and, therefore, could not account for the whereabouts of Airman Moses on the night in question.

> .    .    .    .    .

> Some of the potential alibi witnesses interviewed by the Defense stated that they were intoxicated (by use of alcohol)

during the evening hours of 6–7 February 1987. There was evidence that some had been involved with illicit use of drugs on the night in question. Several of the individuals interviewed by Defense as alibi witnesses had made written statements to the AFOSI. During our interviews, we discovered that some of these witnesses really were not certain of the times they saw Airman Moses in and around the dormitory, despite their prior statements to the AFOSI.

> Captain Victorian and myself were keenly aware of the alibi evidence and defense in this case. We interviewed every individual who could have provided evidence on this point, but concluded it was best to go forward on the alibi defense with the testimony of Airman Moses and Airman McCoyle.

Captain Victorian, Circuit Defense Counsel, has similar memories. Her affidavit states in part:

> As I recall both Airman Cleland and LaChance were interviewed by the defense prior to trial. . . . To the best of my recollection, both denied any knowledge of Airman Moses' whereabouts at the time of the alleged offenses. Furthermore, Cleland clearly implicated himself in use of marijuana. . . . He also implicated Airman Moses in use and distribution of marijuana and introduction of marijuana to a military installation. These allegations were uncharged at the time of trial. . . . These airmen were not called because we had no reason to believe, based on interview that either individual could support Airman Moses' alibi defense. Moreover, the Military Judge granted a motion *in limine* to prohibit the prosecution from introducing evidence of the uncharged misconduct under MRE 404(b). We certainly did not want to open the door to such damning evidence in a heavily litigated case with allegations of sexual assault using a weapon.

> I believe Airman Cleland was called by the prosecution in rebuttal because of Airman Moses' testimony that he went to bed around midnight, whereas Cleland

said he saw him after midnight outside of his room.

The alibi defense was presented through Airman Moses' testimony as to his activities on the day and evening in question including denial of the offenses. Further, Airman Moses testified as to his level of intoxication and fatigue—both being extreme. A1C Ned McCoyle, his roommate, was called to state Moses was in the room that night although he (McCoyle) was uncertain of the time Moses came in. The stipulation of SrA Baltazar related that Airman Moses' car was in the dormitory parking lot, and he did not check the hood of the car to see if it had recently been used; the clear implication being that the hood was cold so Airman Moses had *not* driven it offbase to Airman Warren's trailer.

■ We do not agree with Captain Victorian that any "implication" can be drawn from a policeman not checking a car's hood for heat. However, we do find that overall, her statement and that of Captain Sweetman indicate the defense made a thorough investigation of the alibi defense and made a tactical decision about how to present it. The obligation to investigate and present defenses does not mean counsel must blindly present all evidence and witnesses that are mentioned to them. Defense attorneys are expected to apply their professional training to the task of preparing a defense. This includes making some choices about what evidence to present. If it did not, a clerk could present the defense by merely dumping all evidence and witness statements at the fact finders' feet.

■ What is required is that the appellant be represented by effective defense counsel. *United States v. Jefferson*, 13 M.J. 1 (C.M.A.1982). The counsel is expected to recognize legal issues and objections available and to present available legal issues and objections and defenses. *United States v. Rivas*, 3 M.J. 282, 286 (C.M.A. 1977). The current standard for measuring whether counsel have provided an adequate defense is announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*

the appellant bears the burden to show deficient performance which was so serious as to affect in all probability the outcome of the trial. This requires two showings: a deficiency, and the probability that the deficiency affected the outcome. The appellant has not convinced us that either part of the *Strickland* test has been satisfied.

The appellant's trial defense counsel presented an active and professional defense throughout the trial. There was extensive, and appropriately presented, litigation of all issues—including alibi. The appellant's complaint before us is that he disagrees with the way the alibi defense was presented. The appellant and his roommate both testified about the alibi defense. Further, the defense submitted a stipulation of the expected testimony of the policeman who knocked on their door. This was enough to get the issue before the fact finders. To have presented more evidence on this issue raised very real risks of introducing information that was more harmful to the appellant than the potential good to be served. For example, there was suppressed evidence of drug use by not only the witnesses, but the appellant himself. We need not decide whether we agree with the tactics the defense chose to pursue, only whether the defense was deficient. We hold that it was not.

■ Even if we assume that the defense was deficient, there still remains the difficulty of showing a reasonable probability that the deficiency affected the outcome. *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. The record is replete with information which could have convinced the court-martial of the appellant's guilt. While we do not intend to present a comprehensive list of all the evidence, we will list a few examples. (1) The victim identified the appellant as her attacker. (2) The intruder had a knife which is very similar to the appellant's knife. (3) The appellant claimed that he had never been to the victim's trailer. However, of the total of nine pubic hairs found on the victim's bedsheets and sent for analysis, six were identified as probably being the victim's, one was from an unknown source, and two

were identified as probably being from the appellant. The forensic expert testified that the hairs were "microscopically similar or consistent with the plucked pubic hair standard from Kirk Moses". The expert testified that "essentially all [the 15 to 25 microscopic characteristics of hair] would have to be present in the hair standard before I would call the unknown hair consistent." (4) The appellant made several incriminating comments. He disputes the content of the remarks, and except in the case of the remark to the AFOSI agent he disputes that he even made the remarks, but the statements were before the court-members for their evaluation. The first statement was made while the appellant was being escorted to the hospital for a rape protocol. He broke down and stated to the escorting AFOSI agent, "I don't know why I did it. I have a girlfriend at Andrews. She's much—better—looking than this girl." Later that day he was being returned to the hospital from pretrial confinement by the first sergeant. Shortly after they began the ride to the hospital in the first sergeant's car, the appellant clenched his fists, bent forward and said, spontaneously, "I don't know why I did it. She's not that pretty. My girlfriend in Washington is much prettier. It was stupid." Finally, he made several incriminating remarks to his mother when he called her from the jail to tell her about his situation.

We do not believe the defense was deficient in their presentation of the alibi. However, even if they were, the above evidence is sufficient for us to hold that the uncertain testimony of two "friendly" witnesses would not have affected the outcome. Even assuming away any inconsistencies in the two affidavits, such as the appellant's testimony that he was in bed by midnight while the affiants state he was very much awake at 0100, we are not convinced these statements raise a reasonable doubt about the appellant's involvement. They are simply too inconclusive. The statements refer to spending a long party night in the hallway of a dormitory. People were coming and going. Alcohol was being consumed. In general, the testimony of people who were present that night paints a picture of hubbub and distraction. Common experience teaches that some events could have occurred in that hallway during the four hours the affiants say they were there that might have escaped their attention. Further, all they could really testify to is that the door was closed and they didn't see anyone enter or leave. This is not enough to say that the "outcome" portion of the *Strickland* test has been satisfied.

The dissent places its primary emphasis on *United States v. Scott*, 24 M.J. 186 (C.M.A.1986). Judge Michalski appears to read *Scott* as requiring a face-to-face interview with all alibi witnesses. We do not agree. In the first place no one with any training as an investigator interviewed any alibi witnesses for at least five months after the crime in *Scott*. In the present case trained investigators of the AFOSI interviewed both of the affiants shortly after the incident. In the second place, there is strong indication that both affiants may have been involved in or witnessed illegal activities such as drug use, which would limit the scope of their testimony or open the door to damaging rebuttal evidence about the appellant's drug use. That aspect is missing from the *Scott* case. Finally, the affidavits indicate to us that the defense counsel evaluated the potential testimony of both affiants fully, and probably interviewed both of them. The Court in *Scott* stated that "[u]nder certain circumstances, it may be sufficient for defense counsel to rely on the information provided to him by his client or upon the investigation conducted by the Government." 24 M.J. at 192. In the present case we are convinced the defense's conduct met both the requirements of *Scott* and of the American Bar Association Standards for Criminal Justice 4–4.1 (2d ed. 1980) which states a defense counsel has "the duty ... to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."

We hold that the appellant was not denied his Sixth Amendment right to effective assistance of counsel based on his counsel's failure to investigate, prepare, and present his defense of alibi.

█ The appellant also asserts that the evidence was insufficient to prove that he actually committed the offenses alleged. Suffice it to say we disagree. We find there was a surplus of evidence to establish beyond a reasonable doubt that the appellant committed the charged offenses. We are satisfied, as was the court-martial, that every element of the offenses charged was proved beyond a reasonable doubt. Article 66(c), UCMJ, 10 U.S.C. § 866(c). The findings and the sentence are

AFFIRMED.

Senior Judge FORAY concurs.

MICHALSKI, Judge (dissenting):

Post-trial affidavits submitted by appellant aver that two alibi witnesses known to trial defense counsel were not contacted by counsel. Although affidavits submitted by trial defense counsel contradict those statements, they equivocate. For example, counsel's choice of words, *"I believe that,* during this time of preparation, Captain [V] and myself interviewed all alibi witnesses ..."* (emphasis added), under the circumstances is unfortunate because of the ambiguity caused by this phrase. "I believe that ..." can be synonymous with "I think" or "I suppose". Unwittingly or not, trial defense counsel have thus created the impression that they may not have contacted Cleland and LaChance, the proffered alibi witnesses. Moreover, there is nothing in the record of trial to show these two people were contacted by defense.

At this juncture, there exists therefore an irreconcilable conflict in the opposing affidavits on a major factual issue. This threshold issue is whether appellant was denied his Sixth Amendment right to effective assistance of counsel by counsel's failure to conduct a pretrial investigation of the facts and circumstances. Whether certain individuals should have been called as alibi witnesses is not the issue at this point, but rather were these individuals interviewed by defense, since their testimony may have provided a complete defense to the charges. *See United States v. Scott,* 24 M.J. 186, 192 (1986), "A defense counsel has 'the duty ... to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case....' In many cases, '[p]retrial investigation is ... the most critical stage of a lawyer's preparation.'" Failure to conduct pretrial investigation equates with lack of proper trial preparation thus denying appellant the Sixth Amendment guaranteed right to effective assistance of counsel.

My Brothers allude to appropriate trial tactics in not calling these two witnesses because of concerns about the credibility of the witnesses. As in *Scott, supra,* the question of the alibi witnesses' credibility is appropriate for the trier of fact. However, since the record of trial does not demonstrate that counsel ever interviewed these witnesses, how is it possible to intelligently assess their credibility? Before rendering a decision in this case, I would first resolve the issues posited by the opposing affidavits by means of a limited evidentiary hearing. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).