**UNITED STATES**

v.

**Airman Basic Christopher M. BARNARD, FR 308–94–8838, United States Air Force.**

**ACM S28251.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 19 Dec. 1989.

Decided 12 Dec. 1990.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Major George P. Clark.

Appellate Counsel for the United States: Colonel Robert E. Giovagnoni and Major Paul H. Blackwell, Jr.

Before O'BRIEN, O'HAIR, PRATT and JAMES, Appellate Military Judges.

## OPINION OF THE COURT

JAMES, Judge:

Convicted by a special court-martial of writing 12 checks (totaling $2,177.25) but failing to maintain funds sufficient to pay them on presentment, Airman Basic Barnard was sentenced to be confined for six months and to be discharged from the service with a bad conduct discharge. He briefed six errors, but none of his points merit relief. Accordingly, we affirm.

Appellant claimed that he expected an $8,000 mail-order loan to be deposited to his checking account, but it wasn't, and he insists that the checks bounced because of

this mistake of fact, not because of any "dishonorable failure" on his part. His "mistake" is at the bottom of three of his assertions of error: (1) ineffective assistance of counsel (failure to investigate the defense correctly), (2) failure by the military judge (sitting as trier of the case) to define the mistake of fact defense he applied, and (3) insufficiency of the evidence to overcome his defense. He also claims (4) that the military judge prevented him from testifying during litigation of the admissibility of his statement to investigators, (5) that trial counsel improperly questioned him about his exercise of his right to counsel, and (6) that he was sentenced on multiple specifications that should have been considered one transaction for sentencing.

### I. Effective Assistance of Counsel

The Sixth Amendment right to counsel includes the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984), *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). There are at least two kinds of "effective assistance" issues, and they have different analyses. First, ineffectiveness may be inferred, as when the Government interferes with independent representation. Second, actual ineffectiveness may be shown. *Id.,* 466 U.S. at 687, 104 S.Ct. at 2064. The typical case involves actual effectiveness, the review of the quality of counsel's performance.

When the trial skills of the counsel are in dispute, ineffectiveness must be shown, not presumed. *Strickland* prescribes the two-step analysis for such cases: "First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064. "The purpose [of the Sixth Amendment guarantee of effective assistance of counsel] is simply to assure that criminal defendants receive a fair trial." *Id.* at 689, 104 S.Ct. at 2065. "Unless a defendant makes both showings, it cannot be said

that the conviction ... resulted from a breakdown in the adversarial process that renders the result unreliable," *id.* at 687, 104 S.Ct. at 2064, and that is the point of the Sixth Amendment guarantee. "Although [the Court] discussed the performance component ... prior to the prejudice component, there is no reason for a court ... to approach the inquiry in the same order or even to address both components ... if the defendant makes an insufficient showing on one." *Id.* at 697, 104 S.Ct. at 2069. *Strickland* applies in courts-martial. *United States v. Brothers,* 30 M.J. 289 (C.M.A.1990); *United States v. Griffith,* 27 M.J. 42 (C.M.A.1988); *United States v. Scott,* 24 M.J. 186 (C.M.A.1987).

### A. Deficiency

█ Counsel benefits from a strong presumption that counsel is competent. *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Strickland v. Washington,* 466 U.S. at 689, 690, 104 S.Ct. at 2065, 2066. *See also United States v. Scott,* 24 M.J. 186, 188 (C.M.A.1987). The burden is clearly on the appellant to overcome that presumption, and "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

How big must the errors be to warrant relief? They must be "[e]rrors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. They are errors that affect the reliability of the proof-testing process, not ordinary mistakes. "When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred." *Cronic,* 466 U.S. at 656, 104 S.Ct. at 2045.

Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade. At the same time, even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt. And, of course, even when there is a bona fide defense, counsel may still advise his client to plead guilty if that advice falls within the range of reasonable competence under the circumstances.

*Id.* at 656 n. 19, 104 S.Ct. at 2045 n. 19 (Citations omitted). In short, the criminal defense lawyer is not a potted plant,[1] but neither is that lawyer required to be error-free.

█ The inquiry is broad: "The court must ... determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. The issue is resolved by an objective standard: Reasonably effective assistance "under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2065. Furthermore, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. at 2065. "Review of a defense counsel's trial strategy is difficult, if not impossible, on appeal because the appellate court is not privy to the knowledge of the trial participants except to the extent such information appears in the record trial." *United States v. DiCupe,* 21 M.J. 440, 442 (C.M.A.1986), *cert. denied,* 479 U.S. 826, 107 S.Ct. 101, 93 L.Ed.2d 52 (1986). "Disagreements as to the strategic or tactical decisions made at the trial level by defense counsel will not support a claim of ineffective assistance of counsel so long as

1. The distinguished chairman of the Senate Iran-Contra committee, Senator Daniel K. Inouye, said to Lieutenant Colonel Oliver North's lawyer, Brendan V. Sullivan, Jr., "Let the witness object, if he wishes to." The lawyer replied, "Well, sir, I'm not a potted plant. I'm here as a lawyer. That's my job." Washington Post, July 10, 1987, at sec. A, p. 6. In point of fact, there is room for disagreement about the role of counsel in congressional hearings, but the sentiment is apt in this case.

the challenged conduct has some reasoned basis." *United States v. Mansfield*, 24 M.J. 611 (A.F.C.M.R.1987). *See also, United States v. Garries*, 19 M.J. 845, 862–65 (A.F.C.M.R.1984), *aff'd*, 22 M.J. 288 (C.M. A.1986), *cert. denied*, 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986) ("The fact that appellate defense counsel can show how the case may have been tried differently does not equate to ineffective representation at the trial level."). This is necessary to eliminate the influence of hindsight. The appellate courts must evaluate the circumstances from counsel's perspective.

### B. Prejudice

"Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. The prejudice must be actual, not fanciful, theoretical, or merely possible: "Even if a defendant shows that particular errors of counsel were unreasonable ..., the defendant must show that they actually had an adverse effect on the defense." *Id.* at 693, 104 S.Ct. at 2067. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. "It is not enough ... to show that the errors had some conceivable effect on the outcome...." *Id.* at 693, 104 S.Ct. at 2067.

The errors shown must have pervasive impact: Appellant "must show that such errors prejudiced the defense to the extent that they deprived the [appellant] of a fair trial." *Id.* at 687, 104 S.Ct. at 2064. Once again, the scope on review is broad: "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. at 2068.

### C. Summary

"Since *Strickland* was decided, the [Supreme] Court has never identified an instance of attorney dereliction that met its stringent standard."[2] *Mitchell v. Kemp*, 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987).[3] This results, we suspect, from the stringency of the standard as much as from other explanations. Certainly, examples can be found in military appeals and should be examined for their lessons,[4] but a greater number of such cases found counsel to have satisfied the *Strickland* test.[5] This is not a small issue, easy to investigate or quickly briefed. Ineffectiveness claims require enumeration of the errors by appellate defense counsel, exposition of the circumstances that show them to have been unreasonable and not within the wide range of acceptable skills, and a complete investigation of the facts. Both parties must then meet the challenge of a constitutional issue, synthesizing the lessons of a

2. It's still true, 6 years after *Strickland*.

3. This is not because the Court has had no opportunity to review effectiveness cases. *Mitchell v. Kemp* was but one of several capital cases on its docket in which this issue arose. *See also Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (did not assert error on appeal); *Darden v. Wainwright*, 477 U.S. 168, 184–85, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1985) (adequacy of preparation for sentencing in capital case); *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (counsel refused to cooperate with client's plan to give perjured testimony).

4. For example: *United States v. Bono*, 26 M.J. 240 (C.M.A.1988); *United States v. Scott*, 24 M.J. 186 (C.M.A.1987); *United States v. Mansfield*, 24 M.J. 611 (A.F.C.M.R.1987).

5. For example: *United States v. Curry*, 31 M.J. 359 (C.M.A.1990); *United States v. Miller*, 31 M.J. 247 (C.M.A.1990); *United States v. Brothers*, 30 M.J. 289 (C.M.A.1990); *United States v. Baker*, 28 M.J. 121 (C.M.A.1989); *United States v. Hanson*, 24 M.J. 377 (C.M.A.1987); *United States v. DiCupe*, 21 M.J. 440, 441–42 (C.M.A.1986), *cert. denied*, 479 U.S. 826, 107 S.Ct. 101, 93 L.Ed.2d 52 (1986); *United States v. Geiss*, 30 M.J. 678, 682 (A.F.C.M.R.1990); *United States v. Moses*, 26 M.J. 980 (A.F.C.M.R.1988), *pet. denied*, 28 M.J. 83 (C.M.A.1989); *United States v. Saul*, 26 M.J. 568, 753–74 (A.F.C.M.R.1988), *pet. denied*, 27 M.J. 434 (C.M.A.1988); *United States v. Rios*, 24 M.J. 515 (A.F.C.M.R.1987), *pet. denied*, 26 M.J. 80 (C.M.A.1988); *United States v. Ridley*, 22 M.J. 697 (A.F.C.M.R.1986).

growing number of appellate decisions in the jurisdiction concerned.

### D. Risks of the Ineffectiveness Issue

The standard is stringent indeed, and the issue demands thoroughness from the appellate parties. Any lesser approach would subject our system to exactly the evil described by the Supreme Court:

> The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. In the typical military example, detailed defense counsel have no choice to refuse to accept the assigned case. In such cases, this complaint, so easily made from prison, threatens the foundation of the adversary system by distracting the detailed defense counsel from preparation for trial by dividing his attention, part of it ever over his shoulder at both his client and his appellate brethren.

### E. Application

■ Airman Barnard's core complaint has to do with investigation of his explanation of the relevant events in his fiscal life. All 12 checks were written to the same payee, in 6 instances 2 per date on each of 3 days, in an 8–day period against 2 banks for 2 different purposes (cash and merchandise), and they were apparently presented at those 2 banks within a like period of about 7 days. They total $2,177.25. Of course, that summary depicts a classic spree of "check-kiting," but

Airman Barnard had an explanation: He expected one of his accounts to be replenished by a loan. In the defense view which we now summarize, this 19–year-old airman basic naively but honestly believed that mailing a newspaper clipping and sending $10 would get him—guaranteed—a loan of $8,000, deposited directly by the lender into one of Airman Barnard's two checking accounts. According to the defense, that was a reasonable belief.

Of course, Airman Barnard's loan did not come through as he expected. The loan company went out of business, but belatedly, after Airman Barnard's checks began to arrive and bounce. The company sent back to Airman Barnard his clipped application and check for the $10 application fee, and he offered them into evidence at trial to corroborate his explanation.

Woven into Airman Barnard's explanation is a ghost-like character called Joe Parillo, an employee of the loan company. While trying to unravel his financial woes, Airman Barnard discovered that he had not mailed the $10 fee with the loan application. According to Airman Barnard, he mailed the application on 11 or 12 August 1989, began writing the charged checks on 26 August, and heard from Joe on 28 August. Joe told him that the loan would be approved and deposited but that he had neglected to send the fee, so Airman Barnard did so promptly. Unfortunately, by then he had already written three to five checks against the account concerned. Now assured of a prompt loan, he continued to write checks on that account through 1 September, reaching a total of ten. On 5 September, his first sergeant would tell him that checks against that account had been returned because the account was closed, but the news would come too late for Airman Barnard, for whom it was a surprise.

Airman Barnard's complaint is that the lawyer did not adequately investigate the "Joe Parillo" story. Specifically, he did not interview Joe. The lawyer explains in his affidavit that he came to believe that Joe was fictitious, probably because of the many things about him that Airman Bar-

nard could not explain. At first, Airman Barnard told his lawyer "that there was no reason ... to try to obtain the [toll-free] number [for Joe] since he had tried to recontact Joe Perillo (sic) via this 1–800 number but that it was no longer in service." (Joe's business was in California, but these events occur in Illinois.) More evasiveness followed, until Airman Barnard came to his lawyer with a telephone bill and identified one number as Joe's home telephone number. His lawyer tried unsuccessfully to call Joe there. Finally, and apparently in some exasperation, the lawyer asked the client, in essence, whether this avenue was worthy of pursuit, and the client minimized its value. Says the lawyer—

> ... I decided to tell [Airman Barnard] that I wasn't going to try to call Mr. Perillo (sic) again to see how he would react. I did just that. [Airman Barnard] said, "Fine, no problem." At that point I realized that [Airman Barnard] didn't want me to contact Mr. Perillo (sic) and explore his story. So I didn't.

Affidavit of defense counsel, para. 6. In short, the lawyer suspected that his client might be lying.[6]

■ Though this lawyer's pessimism resembles the hopelessness suffered by the defense counsel in *Strickland*, the issue is not gut instinct but reasoned decision-making.

> [C]ounsel has a duty to make reasonable investigations or to make reasonable decisions that make investigation unnecessary.... a particular decision not to investigate must be directly assessed for reasonableness ..., applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.... And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. This client gave this lawyer all the reason that was needed to concentrate his efforts elsewhere. The decision not to investigate further what the elusive Joe Parillo might have said was within "the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066.[7] Therefore, we need not analyze whether the decision was prejudicial to the defense.

## II. The Right to Put On Evidence On Motions

■ Airman Barnard brings to our attention that the military judge ruled on his confession without permitting him to testify on his objection to it.

Ordinarily, this event alone would be a serious matter, likely reversible error, because the right to testify on such a matter is clearly stated, Mil.R.Evid. 304(f), and of long standing, *see, e.g., United States v. Cooper,* 2 U.S.C.M.A. 333, 8 C.M.R. 133,

---

**6.** In the same affidavit, the defense counsel explains that part of his reasoning was that he did not want to learn as a certainty that his client was lying because that knowledge would give him the perjurious client problem if, as he expected, Airman Barnard wanted to testify in this way at trial. A lawyer has some duty of candor to the forum, *see* Air Force Rule of Professional Responsibility 3.3 and accompanying discussion; *accord,* ABA Model Rules of Professional Conduct, Rule 3.3 and accompanying discussion; *see also* ABA Model Rules of Professional Conduct, Rule 8.4(c), but "[a]n advocate does not vouch for the evidence submitted in a cause ...," ABA Rule 3.3, accompanying comment. The passage of *Strickland* related to investigations and quoted in the text notes that the harmful aspects of investigations can certainly be considered in deciding how much to investigate. We are not compelled today to determine the *dimensions of that obligation, but we find little* to commend deliberate ignorance. Just as a lawyer is not a potted plant, neither may he imitate an ostrich.

**7.** We have *not* overlooked that the defense first offered a plea of guilty to all specifications but that it was found improvident. Rejection of a guilty plea as improvident is not tantamount to a finding of ineffective assistance; the two are entirely separate matters. *See, e.g., United States v. Elliott,* 30 M.J. 1064 (A.C.M.R.1990).

137 (1953), and the testimony of an accused about the circumstances of his own confession is singularly important if believed.

However, Airman Barnard later testified at length and included in that testimony his remarks about the voluntariness of the disputed sentence. Though he did not get to speak when he wanted, he did get to speak, and this case is distinguishable from those in which the accused's voice is not heard, *e.g., United States v. Holbrook*, 17 C.M.R. 868 (A.F.B.R.1954). The military judge was then forced to consider the issue anew because voluntariness remains to affect weight even after the confession has been admitted. Mil.R.Evid. 304(e)(2). Under the circumstances of this case, we find no prejudice to the appellant.

### III. Comment on Exercise of Right to Counsel

Airman Barnard also complains that the trial counsel commented improperly on Airman Barnard's exercise of his right to counsel by cross-examining him to show that between two visits to the investigators, Airman Barnard consulted his lawyer, then returned and gave a statement later used against him at trial. Airman Barnard argues accurately that the "comments" were an "attempt to persuade the court[-martial] that the admission was a voluntary acknowledgment of guilt because the appellant had consulted his counsel before giving the statement." Airman Barnard is exactly right about the intended result of trial counsel's inquiry, but he is mistaken about its propriety.

An accused who chooses to testify on the merits is subject to cross-examination just like any other witness. Airman Barnard did so, and he testified on direct examination on the circumstances of the two interrogations to show that the last sentence of the statement wasn't really his choice. Indeed, it was during direct examination that Airman Barnard volunteered, "I went back on the 29th after talking to counsel, to yourself, and spoke with them...." Trial counsel's inquiry was clearly within the scope of the direct examination. *See* Mil.R.Evid. 611(b). The relevance of his visit to his lawyer is clear: A suspect who, while at liberty, visited with his lawyer immediately before going to give a statement to police investigators can be said to know of his freedom of choice to stop cooperating with the interrogation, and that is some evidence of voluntariness. *See generally* Mil.R.Evid. 401, 402. We note that defense counsel at trial understood this and posed no objection, so the matter is waived. Mil.R.Evid. 103(a)(1).

### IV. Military Judge Presumed to Know the Law, Apply It

Airman Barnard urges that the military judge should inform the parties of the definition of the mistake defense that the military judge will apply when deliberating,[8] but he has cited no authority for his novel proposition. A military judge has no such obligation. Instead, "[t]he military judge is presumed to know the law and

---

**8.** Airman Barnard brings our attention to *United States v. Remele*, 13 U.S.C.M.A. 617, 33 C.M.R. 149 (1963), and *United States v. Dicus*, 33 C.M.R. 879 (A.F.C.M.R.1963), and his reliance on them is understandable but misplaced. Taken in isolation, they imply that the mistake need only be shown to have been honestly held, but other decisions show that the reasonableness of the belief is also at issue. *United States v. Bullock*, 12 U.S.C.M.A. 142, 30 C.M.R. 142 (1961); *United States v. Stratton*, 11 U.S.C.M.A. 152, 28 C.M.R. 376, 379 (1960). Other decisions more completely describe the reasonableness component of the mistake defense: The mistaken belief must be honestly held and not held as the result of gross indifference, *United States v. Brown*, 14 U.S.C.M.A. 633, 34 C.M.R. 413 (1964); *United States v. Bullock*, 30 C.M.R. 142; *United States v. Connell*, 7 U.S.C.M.A. 228, 22 C.M.R. 18 (1956). "Gross indifference" is simply a way of

describing a lack of "reasonableness" so that lay triers of fact will not confuse it with simple negligence and convict wrongly.

"Dishonorableness" is not a specific state of mind, even though it's close: "Indeed, the term 'dishonorable' involves a mental state closely allied to that of a specific criminal intent." *United States v. Groom*, 12 U.S.C.M.A. 11, 30 C.M.R. 11, 13 (1960). *See also, United States v. Brand*, 10 U.S.C.M.A. 437, 28 C.M.R. 3 (1959); *United States v. Lightfoot*, 7 U.S.C.M.A. 686, 23 C.M.R. 150, 152–53 (1957) (Latimer, J., concurring) *United States v. Downard*, 6 U.S.C.M.A. 538, 20 C.M.R. 254, 260 (1955) *United States v. Smith*, 8 M.J. 779, 780 (A.F.C.M.R.1980). Since the crime has no requirement for proof of a specific intent, the mistake of fact defense (to prevail) must rely on a mistake that is both honestly believed and one that can be reason-

apply it correctly." *United States v. Bindley*, 23 M.J. 658 (A.F.C.M.R.1986), *aff'd*, 25 M.J. 222 (C.M.A.1987). *See also United States v. Montgomery*, 20 U.S.C.M.A. 35, 42 C.M.R. 227, 231 (1970); *United States v. Goldsmith*, 29 M.J. 979, 985 (A.F.C.M.R. 1990); *United States v. Allen*, 31 M.J. 572, 602 (N.M.C.M.R.1990); *United States v. Long*, 20 M.J. 657 (N.M.C.M.R.1985); *United States v. Gudel*, 17 M.J. 1075, 1076 (A.F.C.M.R.1984), *pet. denied*, 19 M.J. 93 (C.M.A.1984); *United States v. Montgomery*, 16 M.J. 516, 518 (A.C.M.R.1983); *United States v. Smith*, 12 M.J. 654, n. 656 (A.C.M.R.1981), *pet. denied*, 13 M.J. 120 (C.M.A.1982).

### V. Sufficiency of the Evidence & Mistake of Fact

■ Airman Barnard also asks us to reconsider the evidence to determine whether the mistake of fact defense should have prevailed at trial. That requires that we now inform the reader of the other bank account on which Airman Barnard wrote the charged checks: It had also been closed, as a result of inactivity since June 1988. Even when Airman Barnard expected an $8,000 mail-order loan, he never checked either account to assure that it was current, and he never checked either to see whether the loan had been posted to his account. In short, Airman Barnard's explanation is not credible. The military judge did not believe it, and neither do we. The evidence was sufficient to sustain the convictions. Article 66, UCMJ, 10 U.S.C. § 866.

### VI. Multiplicity For Sentencing

Finally, Airman Barnard invites us to descend with him into that inner circle of the Inferno where the damned endlessly debate multiplicity for sentencing. In the absence of plain error,[9] this issue is not preserved for appeal unless there was an objection at trial. *United States v. Everstone*, 26 M.J. 795 (A.F.C.M.R.1988), *pet. denied*, 27 M.J. 434 (C.M.A.1988). The trial defense counsel made no motion or objection, we think correctly so, and the issue is waived.

### VII. Decision

The findings of guilty and the sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Chief Judge O'BRIEN and Senior Judge PRATT concur.

Senior Judge O'HAIR did not participate in this decision.

---

ably held. R.C.M. 916(j). The parties argued the case in those terms throughout, as they have on this appeal, and the military judge's remarks are consistent with that view.

9. All 12 of the bad check, dishonorable failures are pleaded with word-processor similarity, and all 12 checks were written to the same payee, in 6 instances 2 per date on each of 3 days. Nonetheless, each check is identified and pleaded separately, they were written on 8 different days against 2 banks, for 2 different purposes (cash and merchandise), presumably one at a time as is customary, and that is enough separateness

under R.C.M. 1003(c)(1)(C) to adjudge separate punishment for each. The appellate parties agree that *United States v. Jobes*, 20 M.J. 506 (A.F.C.M.R.1985), *pet. denied*, 21 M.J. 102 (C.M.A.1985), should be instructive, but even applying the principles of "single impulse" and "insistent flow," well analyzed in *Jobes*, one still finds these specifications separate. At the nub, each check was preceded by a separate opportunity to pause, reflect, reconsider, and (especially important in this case) to recalculate the likelihood that there would be money in the bank when that check cleared.