## UNITED STATES

v.

**Sergeant Oscar ANDERSON, Jr., FR415–98–6646, United States Air Force.**

**ACM 29091.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 31 Oct. 1990.

Decided 16 Feb. 1993.

Appellate Counsel for the Appellant: Captain Michael D. Burt (argued), Colonel Jeffrey R. Owens, Lieutenant Colonel Terry J. Woodhouse, Captain Mark R. Land, Major Richard W. Aldrich, Captain Ursula P. Moul, and Captain Robert I. Smith.

Appellate Counsel for the United States: Major Jeffrey C. Lindquist (argued), Lieutenant Colonel Brenda J. Hollis, Lieutenant Colonel Jeffery T. Infelise, and Major Paul H. Blackwell, Jr.

Before LEONARD, McLAUTHLIN and JAMES, Appellate Military Judges.

## OPINION OF THE COURT

JAMES, Judge:

Sergeant Anderson was convicted of escape from confinement, premeditated murder, and an assault.[1] The charges were referred without any limiting instructions,[2] permitting a capital sentence to be available for the murder,[3] but the findings were not reached unanimously,[4] and so confinement for life was adjudged.[5] Sergeant Anderson now assigns numerous errors,

---

1. Violations of Articles 95, 118(1), and 128, UCMJ, 10 U.S.C. §§ 895, 918(1), and 928 (1988), respectively.

2. See R.C.M. 601(e)(1).

3. See Article 118(1), UCMJ, 10 U.S.C. § 918(1) (1988).

4. See R.C.M. 921(c)(2), 922(b)(2).

5. Sergeant Anderson was also sentenced to be discharged from the service with a dishonorable discharge, to forfeit all pay and allowances, and to be reduced to E-1. The convening authority approved the sentence as adjudged.

categorized below as those relating to pretrial procedural matters (referral and venue), rights to counsel, multiplicity of charges, voir dire, evidentiary matters, sufficiency of the evidence, and sentencing matters.[6] It is not necessary to understand all the grisly facts of this case to follow our discussion of the assignments, and we turn directly to the assignments, discussing the facts at each point to the extent necessary. We find some of the assignments to be moot, and we do not decide those. We conclude that one finding must be set aside, but we affirm the remaining findings and the sentence.

### I. Mootness

 Our jurisdiction in this case is conferred by Article 66, UCMJ, 10 U.S.C. § 866 (1988). It permits us to "act only with respect to the findings and sentence as approved by the convening authority." Some of the errors assigned in this case pertain only to matters directly related to capital sentencing, but the sentence as approved does not include death. Those issues are beyond our jurisdiction.

They are also moot. This Court need not review moot issues. To do so is uneconomical and usually exceeds the limits of responsible judging. Several kinds of cases seem to have been disposed of as moot: those which would produce only advisory decisions, would not produce a substantial change in the relationship of the parties, would address only academic questions, and those which would consider only policy

issues more appropriately addressed to a legislature.[7] "Of course, if the case has become moot ... or is not ripe for consideration, then in the proper exercise of its jurisdiction this Court will decline to exercise its jurisdiction." *United States v. Browers*, 20 M.J. 356, 358 (C.M.A.1985). There is flexibility in the mootness doctrine because it is a doctrine of self-restraint, and some exceptions have developed. Thus a court may "decide a case which is moot on its exact facts, but which represents a continuing controversy between the parties." Robert A. Leflar, *Appellate Judicial Opinions* 62 (1974) (quoting Note, *Cases Moot on Appeal: A Limit on the Judicial Power*, 103 U.Pa.L.Rev. 772 (1955)). Another exception has arisen to permit resolution of "questions of great public interest" involving issues that will recur frequently. *Id.*

Though any issue involved in the capital sentencing procedure is necessarily important, capital cases are not frequent in our experience, and it would be unwise for us to begin resolving the myriad special issues that might arise in future capital trials in a case in which the issues need not be fully explored. Accordingly, we have declined to address those issues, as we note at the pertinent places below.

### II. Pretrial Procedure

### A. Referral

Sergeant Anderson has three complaints about the referral of the charges. First, he complains of the appearance of arbitrari-

---

**6.** The briefs of appellate counsel in this case would have been even more useful had the errors and arguments been grouped as listed in the text above.

**7.** *See, e.g., United States v. Valead*, 32 M.J. 122 (C.M.A.1991) (court of military review set aside confinement remaining, mooted constitutionality of "bread & water"); *United States v. Gay*, 18 M.J. 104 (C.M.A.1984) (summary disposition) (capital referral issues mooted by disapproval of capital sentence that resulted); *United States v. Kelly*, 14 M.J. 196 (C.M.A.1982) (advisory decisions); *United States v. McIvor*, 21 U.S.C.M.A. 156, 44 C.M.R. 210 (1972) (would not produce a substantial change in the relationship of the parties); *United States v. Aletky*, 16 U.S.C.M.A. 536, 37 C.M.R. 156 (1967) (academic questions); *United States v. Gilley*, 14 U.S.C.M.A. 226, 34

C.M.R. 6 (C.M.A.1963) (board of review set aside one of three specifications, found it to have had no effect on sentence, and that mooted the propriety of set aside, which TJAG certified. Court of Military Appeals refused to review it as moot.); *United States v. Bedgood*, 12 U.S.C.M.A. 16, 30 C.M.R. 16 (C.M.A.1960) (board of review mooted sentence issue by approving sentence that did not include controverted element); *United States v. Wynn*, 11 U.S.C.M.A. 195, 29 C.M.R. 11 (C.M.A.1960) (adequacy of foundation for evidence mooted when trial judge sustained objection to it); *United States v. Wheatly*, 10 U.S.C.M.A. 537, 28 C.M.R. 103 (C.M.A.1959) (when board of review finds evidence factually insufficient, issue of legal sufficiency becomes moot); *United States v. Gee*, 26 C.M.R. 543 (A.B.R.1958) (board of review refused to consider policy issue).

ness, an appearance into which the defense wished to delve at trial by examining the convening authority. Second, he complains that the military judge refused to require the convening authority to appear to testify on the foregoing issue. Third, he complains that the convening authority was himself suspected of misconduct.

Sergeant Anderson argues that the convening authority had nothing to guide the exercise of his discretion. Therefore, he concludes, the decision to refer the case as capital—without limiting instructions [8]— must have been arbitrary. A convening authority might, in a case like this one, refer the major charge to a court-martial but give the court-martial instructions limiting it to a non-capital sentence. *See* R.C.M. 601(e)(1) ("proper instructions") and accompanying discussion. Sergeant Anderson argues that this decision should, like the sentencing decision, be guided by some established factors to prevent arbitrary exposure of defendants to capital sentences. We view his assignment as having been mooted by the non-capital sentence in his case, and we do not decide it.[9] *United States v. Gay,* 18 M.J. 104 (C.M.A.1984) (summary disposition). For that reason it is also unnecessary to consider whether it was error not to require the convening authority's appearance.

■ Sergeant Anderson also brings to our attention the fact that the convening authority who referred this case was himself suspected of misconduct. In an unrelated case involving the same commander, we set aside the convening authority's action in an abundance of caution and remanded the case for a new post-trial action under Article 60, UCMJ, 10 U.S.C. § 860 (1988), by a different convening authority. *See generally United States v. Kroop,* 34

M.J. 628 (A.F.C.M.R.1992), *pet. filed,* 36 M.J. 4, 41 (C.M.A.1992). However, the commander concerned only referred Sergeant Anderson's case and had been succeeded by the time the post-trial activities began. Thus, the post-trial action in Sergeant Anderson's case—the procedural step about which we were concerned in *Kroop*—was not affected.

We fashioned relief in *Kroop* to recognize the effect of any "psychological baggage" that might have been borne by a convening authority whose own misconduct was similar to that involved in a case under his post-trial review. Sergeant Anderson argues that the same effect might be found in the decision to refer, and he asks that we set aside the findings and sentence for that reason. We decline for two reasons. First, we have never been shown that the misconduct of which the commander in *Kroop* was suspected included violent behavior like that with which Sergeant Anderson was charged, and so the cases are qualitatively different. *See United States v. Williams,* 35 M.J. 812, 820 (A.F.C.M.R.1992) (on recon.). Second, we addressed at length the idea that the *Kroop* phenomenon might affect referral in *Kroop,* 34 M.J. at 631–33, and concluded that no relief would be warranted. We find no need for such relief in this case, either.

### B. Change of Venue

■ Sergeant Anderson moved at trial for a change of the place of trial because of pretrial publicity, *see* R.C.M. 906(b)(11), but his motion was denied. He assigns the denial as error.

There is no doubt that news media published reports of the murder and of the later car-truck collision which some take as Sergeant Anderson's attempt at suicide.

---

**8.** We do not reach the interesting question whether a convening authority's decision to do nothing, to refer but refrain from adding limiting instructions, is reviewable. The defense misstates the matter a bit, perhaps in forensic excess. The case was capital because Congress made premeditated murder a capital offense, not because the convening authority made it capital. Restated in less advantageous terms, one might say that the defense complaint is that the convening authority refrained from extend-

ing to it a generosity that he might have extended.

**9.** However, we also note that Sergeant Anderson is mistaken. The discussion which accompanies R.C.M. 601(e)(1) provides that "the convening authority should be guided by the criteria for adjudging capital punishment found at R.C.M. 1004."

When questioned by the military judge, two members of the court-martial disclosed that they had seen such reports. They recalled the reports only generally, not in such detail as to threaten fairness.

■ A change of the place of trial—the near counterpart of "venue" in civilian practice—is available when the movant shows that the court-martial would be influenced by a general atmosphere of hostility or partiality. *United States v. Gravitt,* 5 U.S.C.M.A. 249, 17 C.M.R. 249, 257 (1954); *see also United States v. Vigneault,* 3 U.S.C.M.A. 247, 12 C.M.R. 3 (1953); *United States v. Hagelberger,* 3 U.S.C.M.A. 259, 12 C.M.R. 15 (1953). Publicity alone is not enough. *United States v. Svenson,* 35 C.M.R. 645, 650 (A.B.R. 1965), *pet. denied,* 15 U.S.C.M.A. 694, 36 C.M.R. 541 (1965); *United States v. Doyle et al.,* 17 C.M.R. 615, 634–36 (A.F.B.R. 1954), *pet. denied,* 5 U.S.C.M.A. 840, 17 C.M.R. 381 (1954); *United States v. Smith,* 1 M.J. 1204, 1207–8 (N.C.M.R.1977), *pet. denied,* 3 M.J. 165 (C.M.A.1977). The fact that a member is acquainted with the case is not disqualifying. *Svenson,* 35 C.M.R. at 650; *United States v. Talbott,* 12 U.S.C.M.A. 446, 31 C.M.R. 32 (1961). The burden of proof of the need for the change is on movant, R.C.M. 905(c); *Gravitt,* 17 C.M.R. 249; *Doyle,* 17 C.M.R. at 635–36. We review the trial judge's denial only for abuse of discretion. *United States v. Carter,* 9 U.S.C.M.A. 108, 25 C.M.R. 370, 374 (1958); *Doyle,* 17 C.M.R. at 636. We find no abuse here.

## C. Motion for Abatement

■ The murder in this case occurred off base, in Austin, Texas, and it was first investigated by civilian police. The military sought and obtained the agreement of the civilian prosecutors for a military prosecution, though perhaps unnecessarily,[10] but the Texas charges remained pending

and would likely have been dismissed without prejudice to renewal. Air Force policy provided at the time of this trial, as now, that *military* prosecution should not *follow* a state trial on the same misconduct without permission by the Secretary, Air Force Regulation 111–1, *Military Justice Guide,* paragraph 3–7a (30 September 1988) (hereafter AFR 111–1).[11] Sergeant Anderson was aware of the pendency of Texas charges and asked the military judge to abate the military prosecution until the Texas charges were dismissed with prejudice in order to prevent a *state* prosecution *after* a federal trial. The military judge denied the motion.

Sergeant Anderson gave no authority at trial requiring the relief he sought, and he has not improved his argument on appeal. While some might view a successive state prosecution as unfair, the legal question is within the authority of a Texas court to decide, the policy choice is a matter for Texas prosecutors to decide, and whether any resulting conviction would be sustainable is a matter for the Texas courts to address first. *See* R.C.M. 201(d)(2)–(3) and accompanying discussion. No relief is warranted on this assignment.

## III. Right to Counsel

Sergeant Anderson assigned three errors relating to the right to counsel. First, he complains that the military judge denied his request for an order requiring that he be supplied with "death-qualified" counsel. We regard this issue as mooted by the noncapital sentence, and we do not address it further. Next, he also complains that he was denied his statutory right to military defense counsel of his own selection. Finally, he complains that the military judge denied his request that his defense counsel be provided with daily transcripts of the testimony.

10. *See generally* annotation, Romualdo P. Eclavea, *Acquittal or Conviction in State Court as Bar to Federal Prosecution Based on Same Act or Transaction,* 18 A.L.R.Fed. 393 (1974).

11. The Department of Justice policy is similar. *See generally* annotation, Juan F. Rydstrom, *Effect on Federal Criminal Prosecution or Conviction of Prosecutor's Noncompliance With Petite Policy Requiring Prior Authorization of Attorney General for Federal Trial Where Accused Has Been Previously Prosecuted for Same Acts in State Court,* 51 A.L.R.Fed. 852 (1981).

## A. Military Defense Counsel of Selection

Sergeant Anderson raises for the first time on appeal his complaint that his pretrial request for military counsel of his own selection was denied. *See* Article 38(b), UCMJ, 10 U.S.C. § 838(b) (1988); R.C.M. 506(b). He filed his request correctly before trial, and it was denied. The denial was reviewed before trial, and the denial was affirmed. However, Sergeant Anderson did nothing further at trial. The government now urges that the matter is waived, citing R.C.M. 905(b)(6).

There is some authority for such a waiver. *United States v. Mitchell*, 15 U.S.C.M.A. 516, 36 C.M.R. 14 (1965); *cf. United States v. West*, 13 M.J. 800 (A.C.M.R.1982) (denial waived where accused did not seek administrative review of denial). However, *Mitchell* preceded substantial changes in the statute and the implementing procedural rules. The present rules seem to be in conflict on the idea of waiver.

■ R.C.M. 905(b)(6) requires that an objection based on a denial of a request for military counsel of choice be raised before a plea is entered, and R.C.M. 905(e) provides that failure to raise an objection under R.C.M. 905(b) constitutes waiver. However, a military judge has no authority to reverse an administrative denial of a request for defense counsel of one's own selection because the judge does not command the counsel, and "[d]ismissal of charges for even a 'deliberate' violation of the constitutional right to counsel 'is plainly inappropriate.' " *United States v. Redding*, 11 M.J. 100, 110–12 (C.M.A.1981) (quoting *United States v. Morrison*, 449

U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)). Instead, the military judge may only make a record and make findings on the matter. R.C.M. 906(b)(2). This quirk in the present rules might be said to abate the *Mitchell* waiver.

Thus, if there is any waiver, it may be simply the waiver of the opportunity under R.C.M. 906(b)(2) to make a full and complete record for appellate review and to ask a military judge to make and enter findings on the matter. There is great value in those findings: They can be conveyed to the convening authority who, having the benefit of another view, might seek to have the requested defense counsel detailed. Another benefit to renewing the matter before a military judge is that it clearly records the accused's continuing wish that the lawyer sought be detailed to his defense. In this case, for example, Sergeant Anderson sought and obtained the service of a different lawyer as military defense counsel of choice, leaving his choice at the time of trial ambiguous. The ambiguity was not helped when, after the required advice,[12] the military judge made the customary inquiry:

MJ: Sergeant Anderson, do you have any questions about your rights to counsel?

Acc: No, sir.

MJ: Then whom do you want to represent you?

Acc: Major B, Captain R, and Captain L.

MJ: Very well. Then you wish to be represented by your detailed counsel, Major B and Captain R, and then Cap-

---

**12.** R.C.M. 901(d)(4). To make this matter even more waiveable, note that the advice about the right to defense counsel was given twice. The military judge who was detailed to this trial at its beginning became ill and could not continue. He gave it once, on June 21, 1990, before his illness. On that occasion, Sergeant Anderson named as his lawyers Major B and Captain R, the two detailed defense counsel. The request for Captain N as defense counsel was made on July 10, 1990, between sessions. The last administrative review of the denial of that request was dated August 1, 1990. Meanwhile, Sergeant Anderson had been informed that Captain N would not be available, and so on July 30, 1990,

he requested Captain L as defense counsel. Captain L was made available and appeared at the next session of trial, on September 5, 1990. The passage quoted above is from the transcript of that session, presided over by a different military judge. It would be difficult for Sergeant Anderson to suggest that he remained mute about the denial of his request for Captain N because he was uninformed of his rights or of the interest of the military judges in his exercise of them. Furthermore, there was no motion at trial for a continuance of such a period as might alleviate the workload impediments that prevented the government from making Captain N available.

tain L as your individually requested counsel?

Acc: And, also a representative that's ABA qualified.

MJ: Very well. I understand that, and that's the nature of a motion that we're going to take up. And, so you wish to be represented by both your detailed and then by Captain L as individual military counsel?

Acc: Yes, sir.

No one at trial ever mentioned Captain N, the counsel whose service had been denied.

■ We conclude, with hesitation, that the *Mitchell* waiver still exists. It was based on consideration of sound and orderly procedure that would be reduced to a "shambles" if it were otherwise. 36 C.M.R. at 18. Sergeant Anderson waived his objection to the denial of his request for counsel of choice by failing to make an objection at trial. *Mitchell*, 36 C.M.R. 14. While his only available relief at trial was the opportunity to make a record, that opportunity is a critical element of the judicial process. Sergeant Anderson's failure to exercise this opportunity requires this Court to speculate on whether he still wanted the requested counsel at trial. An orderly and efficient judicial process does not tolerate speculation.

■ Because of our hesitation concerning waiver, we also review the denial on its merits. In so doing, we treat Sergeant Anderson's failure to raise the issue at trial as a waiver of his opportunity to make a record of the denial of his request because that much is clear. We will hold against Sergeant Anderson any ambiguities or deficiencies in the record because the burden of showing the denial to have been an abuse of discretion must be borne by the aggrieved party. *United States v. Gatewood*, 15 U.S.C.M.A. 433, 35 C.M.R. 405, 408 (1965); *United States v. Cutting*, 14 U.S.C.M.A. 347, 34 C.M.R. 127, 132 (1964).

The record is adequate in this case to permit us to review the denials. It includes:

1. Sergeant Anderson's request for Captain N, the area defense counsel[13] at Eaker Air Force Base, Arkansas, as an individual military counsel, dated 10 July 1990;

2. A reply, dated 27 July 1990, by the convening authority reciting a denial by Captain N's supervisor, the chief circuit defense counsel for the Third Judiciary Circuit;

3. A second request, dated 30 July 1990, for a *different* lawyer, Captain L; and

4. A teletype message from the acting chief of the Military Justice Division in the Office of The Judge Advocate General, dated 1 August 1990, affirming the supervisor's denial of Captain N, the first requested lawyer.[14]

Since Captain N was not assigned to the convening authority's command and was not exempted,[15] the convening authority properly forwarded Sergeant Anderson's request to the chief circuit defense counsel for the Third Judiciary Circuit to determine Captain N's availability.[16] The chief circuit defense counsel determined that Captain N was not available.[17] We cannot examine

---

13. An area defense counsel is an Air Force lawyer detailed exclusively to defense work at a base. Such counsel are organized geographically according to the Judiciary Circuits in which they are located. The area defense counsel in a Judiciary Circuit are supervised and managed by a chief circuit defense counsel.

14. While Sergeant Anderson's appeal of the earlier denial of his request for Captain N is not contained in the record, this message is a response to such an appeal.

15. An area defense counsel is exempt from service as a defense counsel of choice only if assigned to a different Judiciary Circuit and at location that is more than 300 miles away from the site of the trial. Air Force Regulation 111–1, *Military Justice Guide*, paragraph 8–4b(2) (September 30, 1988). We take judicial notice that Captain N was assigned to the same Judiciary Circuit as the site of the trial.

16. *See* AFR 111–1, paragraph 8–5b.

17. The regulation required the chief circuit defense counsel to notify the convening authority of his reasons. *See* AFR 111–1, paragraph 8–4d(4). We infer from the evidence of the government's compliance with the regulation that the chief circuit defense counsel also complied with this requirement. Were it otherwise, pre-

the reasons for his determination directly because they are not in the record. Sergeant Anderson's request for Captain L was ultimately granted. Captain L and two detailed counsel represented Sergeant Anderson at trial. Sergeant Anderson's appeal of the denial of his request for Captain N was properly forwarded to the chief of the Military Justice Division in the Office of the Judge Advocate General.[18] The teletype message recites the causes for the denial that were missing from the convening authority's reply: [19]

> Captain N is not available ... in view of [Captain N's] having assumed the position of area defense counsel only on 29 July 1990, one month after the previous area defense counsel had departed [pursuant to a permanent change of station]. Further, in the absence of unique qualifications of this particular counsel, counsel's assignment as [military counsel of choice] would disrupt the orderly administration of military justice at [the base to which the requested counsel was assigned] and within the Third Judiciary Circuit by virtue of his extended absence.

▆▆▆ There is no constitutional right of an accused to have counsel of his own choice provided free by the government. *Redding*, 11 M.J. at 110. However, Article 38(b)(3)(B), UCMJ, 10 U.S.C. § 838(b)(3)(B) (1988), gave Sergeant Anderson the right to military counsel of his own selection if that counsel was reasonably available. *See generally United States v. Gnibus*, 21 M.J. 1 (C.M.A.1985). The code specifically directs each branch of service to define "reasonably available" and establish procedures for determining when a requested counsel is reasonably available. Article 38(b)(7), UCMJ.

As a prelude to our further discussion, one must first notice that some counsel are exempted from service as defense counsel of choice by virtue of objective criteria in R.C.M. 506(b)(1) and, by delegation, AFR 111–1, paragraph 8–4b. They are, by definition at R.C.M. 506(b)(1), not "reasonably available." When the request is for a lawyer who is not so exempted, the decisionmaker must determine the matter according to more subjective criteria set by the Secretary pursuant to the delegation of authority at R.C.M. 506(b). The Air Force defines "reasonably available" as follows:

> [T]he requested person is not considered to be unavailable by either the MCM or this regulation and ... the appropriate authority ... has determined, in light of the circumstances surrounding the request, that the requested person can perform the duties of individual military defense counsel for the requesting accused without unreasonable expense or detriment to the United States and without unreasonable delay in the proceedings for which requested.

AFR 111–1, paragraph 8–4b(1); *see generally United States v. Quinones*, 23 U.S.C.M.A. 457, 50 C.M.R. 476, 477 n. 4 (1975). This regulation also provides the administrative procedure for answering and reviewing requests for counsel.[20] For those requests for defense counsel who are not exempted, AFR 111–1, paragraph 8–4b(4), provides the following subjective considerations for determining whether the requested counsel is reasonably available:

> (a) The duties, workload, and assignment status of the requested counsel.
>
> (b) The experience level, duties, and workload of the military counsel detailed to represent the accused.

---

sumably Sergeant Anderson would have made a record of the procedural non-compliance as R.C.M. 906(b)(2) would have permitted.

**18.** *See* AFR 111–1, paragraphs 8–4e(2), 8–5b, and 8–5c.

**19.** "[T]he case before us teaches the need to record the action of appropriate officers on accused's request, together with any reasons for its refusal. Only then will this Court and other

agencies be able to make an enlightened decision concerning its disposition before or at trial." *United States v. Cutting*, 14 U.S.C.M.A. 347, 34 C.M.R. 127, 132 (1964). Nothing has changed. The record in this case was marginal, but the explicit provision at R.C.M. 906(b)(2) of an opportunity to make a record puts the fault for its brevity at the movant's doorstep.

**20.** *See* AFR 111–1, paragraphs 8–4d, 8–4e, 8–5b, and 8–5c.

(c) The nature and complexity of the charges and legal issues involved in the case.

(d) Whether a certified assistant trial counsel has been detailed to the case.

(e) Scheduled, pending, and predictable workload of the office to which the requested counsel is assigned and the availability of personnel to meet those demands.

 We will examine the denial of the requested counsel and its review for an abuse of discretion. *Quinones,* 50 C.M.R. at 480; *Gatewood,* 35 C.M.R. at 407; *see also United States v. Matthews,* 15 M.J. 622 (N.M.C.M.R.1982); *United States v. Paul,* 46 C.M.R. 421, 424 (A.C.M.R.1972); *United States v. Genesee,* 26 C.M.R. 845, 849 (A.F.B.R.1958); *cf. United States v. Brownd,* 6 M.J. 338 (C.M.A.1979) (denial of deferment of service of adjudged confinement by convening authority tested for abuse of discretion); *United States v. Berri,* 30 M.J. 1169, 1173 (C.G.C.M.R.1990), *aff'd,* 33 M.J. 337 (C.M.A.1991) (denial of a request for retention of detailed counsel when the accused was represented by individual military counsel). Though Sergeant Anderson's request received a remarkably perfunctory and conclusory answer that did not address either the five factors or all the elements of the definition of "reasonably available," *see generally Quinones,* 50 C.M.R. 476, we find that sound reasons existed for the denial. *See United States v. Ettleson,* 13 M.J. 348, 354–55 (C.M.A. 1982). The point was that the requested counsel suffered the disadvantages of a lawyer newly assigned to an office that had been vacant for a month, and the community he was to serve had done without for that time. The decision-makers concluded that it would be an "unreasonable detriment" to the United States to overcome the further disservice to that community which would have resulted had the lawyer been sent away from it on other business without a substitute. That is a sensible reply. We find no abuse. Accordingly, we find no merit to Sergeant's Anderson's complaint concerning the denial of his request for Captain N.[21]

### B. "Dailies"

 Sergeant Anderson moved at trial for daily transcripts of the testimony. He cited no authority except general references to the Fifth and Sixth Amendments. His motion was denied. Nothing in military procedure provides for daily transcripts of the testimony. *Cf.* Articles 1(14), 28, 38(a), 54, UCMJ, 10 U.S.C. §§ 801(14), 828, 838(a), 854 (1988); R.C.M. 502(d)(5), (e)(3)(B), 1103, and discussion accompanying R.C.M. 502(d)(5) at (E) and (F). Nothing grants a right to the accused to have them, valuable as "dailies" might be to an advocate. Indeed, Articles 54(d) and 1103 might imply the opposite. There is no right of an indigent to have daily transcripts. *Walle v. Sigler,* 456 F.2d 1153, 1156 (8th Cir.1972); *Martin v. Commonwealth,* 221 Va. 436, 271 S.E.2d 123, 130 (1980). *Cf. Roberts v. La Vallee,* 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967) (if a transcript of preliminary hearing is made available and sold to other defendants, then indigents must be given access for free). Even had there been some authority for the motion, Sergeant Anderson has made no offer at all of any prejudice resulting from the denial. No relief would be warranted without it. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1988).

Having found the denials not to have constituted an abuse of discretion, we need not address the further, interesting issue, Was the first denial remedied when the second request was granted? The statutory right is to a lawyer of the accused's own selection, and Sergeant Anderson did have the services of such a lawyer, though not his first choice. *Cf. United States v. Cutting,* 14 U.S.C.M.A. 347, 34 C.M.R. 127, 131 (1964) (no waiver where accused was wrongly denied, proceeded with detailed counsel without objection).

---

21. Even if we did find merit in the complaint, Sergeant Anderson has not demonstrated any prejudice. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1988); *see United States v. Berri,* 30 M.J. 1169, 1173 (C.G.C.M.R.1990), *aff'd,* 33 M.J. 337 (C.M.A.1991) (testing for prejudice). Sergeant Anderson's second request for a particular military counsel was granted, and he was permitted to retain both of his detailed counsel. Furthermore, Captain N was not shown to have had any qualifications or experience that distinguish him from the counsel of record.

## IV. Multiplicity

Sergeant Anderson was charged separately with murder and with an assault consummated by a battery, violations of Articles 118 and 128, UCMJ, respectively. He moved for relief before pleas on the ground that the two charges were multiplicious for findings. The military judge denied the motion, and Sergeant Anderson now renews the matter on appeal.

▮▮▮▮▮ Perhaps the best guide to multiplicity is *United States v. Baker*, 14 M.J. 361 (C.M.A.1983). It requires that we first determine whether the two offenses were part of one transaction or what was substantially one transaction. We conclude that they were. Next, we examine the pleadings to determine whether they constitute a multiplication of charges. That state is apparently necessarily implied when one of the two allegations is a lesser included offense of the other, and such might seem to be the case here. However, when examining the relationship between the two charges, one looks not only at the elements of proof but also to the factual allegations. *United States v. Stottlemire*, 28 M.J. 477 (C.M.A.1989). The assault charge alleged different touchings from those alleged in the murder, so they are separate. *Cf. United States v. McCray*, 16 M.J. 122 (C.M.A.1983) (summary disposition) (same touchings).

▮▮▮▮ Even if there was any multiplication, we conclude that it was not unreasonable. It simply put Sergeant Anderson on notice of the prosecution's intent to prove the non-lethal striking and kicking as distinct from the stabbings by which the murder was committed. As Sergeant Anderson remarks in his brief, evidence of those acts would likely have been admissible even without the assault charge, but pleading the assault left no doubt either of the admissibility of that evidence or of the

prosecution's intent to offer it. We conclude on these factors that it was not error to deny the motion to dismiss the assault charge.

Next we must determine whether it was proper to permit findings of guilty on both charges. *Baker*, 14 M.J. at 367. Once again, it is important that the two charges have different allegations of facts, different enough that they are separate. In view of our last step on this issue, we doubt that any relief would be required if they weren't, except perhaps to tidy up the conviction record by consolidating the two.

The last step in a multiplicity case is sentencing. The military judge correctly determined, sua sponte, that the assault and murder were multiplicious for sentencing and instructed the members accordingly.

## V. Voir Dire and Challenges

Sergeant Anderson has three complaints about voir dire and challenges. He proposed that a questionnaire of his design be submitted to the members before voir dire, but the military judge denied the proposal. He moved for an order requiring that challenged members be replaced by at least one replacement for each member excused, but the military judge denied that motion, too. Finally, he objected at trial to excusal (on challenge for cause) of a member, Major S.

### A. Questionnaire

▮▮▮▮ Sergeant Anderson's questionnaire was extensive. He cited as authority R.C.M. 912(a)(1), which provides that the trial counsel *shall* upon request submit to the members a questionnaire that solicits information enumerated in the rule,[22] and which further provides that "[a]dditional information *may* be requested with the approval of the military judge." (Emphasis added.) The Executive procedural rule simply follows a middle course between the

---

22. This is the so-called *"Credit* information," after *United States v. Credit*, 2 M.J. 631 (A.F.C.M.R.1976), *rev'd on other grounds*, 4 M.J. 118 (C.M.A.1977). *Credit* simply listed the information to which access may be given under the Freedom of Information and Privacy Acts, codified at 5 U.S.C. §§ 552 and 552a (1988). Regardless where *Credit* came from, the name is

unfortunate. We have often wondered how members must react and view our system when young counsel considerably their junior have the gall to demand *"Credit* information" about them. Formbooks everywhere should be scrubbed clean of that phrase, and, where authority is needed, R.C.M. 912(a)(1) should be cited in its stead.

public right of access to information and the traditional discretion of the military judge to regulate voir dire, which is reflected at R.C.M. 912(d). *See generally United States v. Slubowski*, 7 M.J. 461, 463 (C.M.A.1979) (judge's authority to regulate examination). When the inquiry seeks more than the public has a right to know, the matter lies within the judge's discretion, and we will review his decision only for abuse.

The military judge did not foreclose inquiry into the matters proposed by Sergeant Anderson's questionnaire. Instead, he simply refused to order use of a questionnaire. As a result, any such inquiry would be conducted in the courtroom, subject to his supervision. We cannot fault such a choice, and we certainly find no abuse of discretion.

### B. Replacements

■ Sergeant Anderson's argument for one-for-one replacement of challenged members has numerical appeal. His point is that every challenge that does not reduce the court-martial below its quorum would otherwise reduce the number of concurring members needed to reach the required unanimous finding on capital murder,[23] the capital factors,[24] and on a capital sentence.[25] Of course, the same is true in a non-capital case: Every member excused without a replacement is one fewer member who must be persuaded by the prosecution to vote for a conviction or sentence, regardless of the crime or punishment or the fraction needed for a conviction or sentence. Because his proposal relates as well to non-capital cases as to capital cases, it can hardly be said to have become moot by the absence of a death sentence in this case. However, an allied idea was been considered in a capital case, *United States v. Curtis*, 32 M.J. 252, 267–68 (C.M.A.1991), *cert. denied*, — U.S. —, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), which held that nothing requires that a steady membership of 12 be maintained. The code provides no support for Sergeant Anderson, either.

**23.** *See* R.C.M. 922(b)(2).

**24.** *See* R.C.M. 1004(b)(7).

Accordingly, we find no merit to his assignment.

### C. Member Excused

Sergeant Anderson's last assignment about voir dire and challenges has to do with Major S, a member whose replies on examination showed that he opposed capital punishment. Major S also had a prior acquaintance with Sergeant Anderson: Major S had been Sergeant Anderson's supervisor, and she was aware of a prior episode in which Sergeant Anderson assaulted his wife. Trial counsel challenged Major S for cause. Sergeant Anderson objected, but the military judge considered both aspects of Major S's replies and excused Major S. Sergeant Anderson now relies on *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and implicitly urges us to see this solely as a capital punishment matter.

Even if we viewed this challenge as solely a capital punishment matter, we would find no error. *See U.S. v. Curtis*, 33 M.J. 101, 106–7 (C.M.A.1991). However, that aspect is now moot. *Witherspoon* and *Curtis* are cases in which a death penalty was adjudged, and *Witherspoon* was clearly and explicitly limited to relief from the capital sentence and equally clearly and explicitly barred relief from the conviction. Death was not adjudged here, and so the no-death and pro-death composition of the court-martial is irrelevant. Thus, instead of focusing on the *Witherspoon* aspect as Sergeant Anderson asks, we find it much less important than the member's prior knowledge.

■ The trial judge has considerable discretion on challenges, even if not boundless. *United States v. Berry*, 34 M.J. 83 (C.M.A.1992); *United States v. Smart*, 21 M.J. 15, 18–19 (C.M.A.1985). The military judge's wise choice also prevented the possibility of serious harm to this trial from Major S's prior knowledge, which carried significant potential for prejudice. She was clearly vulnerable to challenge for that reason, R.C.M. 912(f)(1)(N), regardless of

**25.** *See* R.C.M. 1006(d)(4)(A).

her views on capital punishment.[26] There was no abuse of discretion.

## VI. Evidentiary Matters

Sergeant Anderson assigned several errors which may be categorized as evidentiary matters. He moved at trial to have the charges dismissed for failure to preserve all the evidence at the crime scene, but the motion was denied. He also brought to the military judge's attention that the trial counsel had consulted with the president of the pretrial mental examination board. He objected to admission of a policeman's opinion about the cause of injuries to the victim's neck. Perhaps his most complicated complaint relates to admission of his "Last Will and Testament," a narrative which he contended was more prejudicial than probative and which contained uncharged misconduct. He also complains that the military judge erred when he omitted a limiting instruction about the "Last Will," and he complains that his trial defense counsel were ineffective because they elected to have no instruction rather than the instruction proposed by the military judge. Finally, he complains that the second of two prior statements of a witness to police investigators was admitted over his objection.

### A. Failure to Preserve Evidence

█ Sergeant Anderson telephoned relatives and told them that he thought he might have killed his wife. The relatives telephoned authorities in the city where Mrs. Anderson lived, and police went to her apartment. With little information in hand, they used a rapid method of entry calculated to surprise and overwhelm any remaining hostile occupants to assure that the premises were made safe as quickly as possible. Other investigators arrived later for the customary crime scene investigation. During the course of the police entry and investigation, argues Sergeant Anderson, it is possible that exculpatory evidence was destroyed. Furthermore, not all the evidence was secured, and some that was seized was mishandled. As an example of the former, the landlord removed, discarded, and replaced blood-stained carpet before the stain was analyzed. As an example of the latter, the blade of a knife—which might have yielded fingerprints or other information—was covered with tape during the investigation, perhaps corrupting any evidence that had remained. Sergeant Anderson objected to these events at trial. He claimed that his theory of defense included the idea that he and his wife engaged in mutual combat that escalated, an idea which, if believed in the context of the other evidence, might have refuted the evidence tending to prove premeditation and perhaps that tending to prove intent to kill. He moved for a dismissal of the charges on the theory that the several failures to preserve evidence constituted a denial of due process.

The Supreme Court limited the duty of the government to preserve evidence on behalf of defendants in its first major decision on the subject:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*California v. Trombetta*, 467 U.S. 479, at 488–89, 104 S.Ct. 2528, at 2533–34, 81 L.Ed.2d 413 (1984) (citations omitted). *See United States v. Kern*, 22 M.J. 49 (C.M.A. 1986) (making *Trombetta* applicable in military law in the context of Article 46). The police in this case made no effort to test the blood on the carpet. Sergeant Anderson argues that it might have been

---

**26.** To put *Witherspoon* even further into context, note that the veniremen in *Witherspoon* were apparently questioned first about their views on capital punishment, and the no-death veniremen were stricken immediately. Thus, *Witherspoon* tells us nothing about the present case, in which a no-death member was questioned further and found to suffer another dangerous impediment to service that supplied an independent and sound ground for challenge.

found to have been his blood, proving the mutuality of the combat, perhaps even self defense. He makes at least a superficial case for relief under *Trombetta,* but there is yet another step:

> We ... hold that unless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Arizona v. Youngblood,* 488 U.S. 51, at 57, 109 S.Ct. 333 at 337, 102 L.Ed.2d 281 (1988). *Accord United States v. Garries,* 22 M.J. 288, 292–93 (C.M.A.1986), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986); *Kern,* 22 M.J. at 52 (no bad faith found); *United States v. Mobley,* 28 M.J. 1024, 1028 (A.F.C.M.R.1989), *aff'd,* 31 M.J. 273, 274–78 (C.M.A.1990) (q.v., addressing Article 46 "equal access" aspect when, as here, the police neglect was by civilian police); *see generally* annotation, Gary Knapp, *Prosecution Failure to Preserve Potentially Exculpatory Evidence ...,* 102 L.Ed.2d 1041 (1990). Here, as in *Youngblood,* the police failure can be described as, at most, negligence or, in the terms of the dissenters in *Youngblood,* ineptitude. There was no showing of bad faith in this case. Accordingly, no relief was warranted, and the assignment is without merit.

## B. Mental Examination & Privilege

Sergeant Anderson moved at trial to inquire into the prosecution's discussions with a forensic psychiatrist who had been the president of a mental examination board that examined Sergeant Anderson. *See generally* R.C.M. 706. The purpose of the inquiry was to discern whether there had been any breach of the privilege in favor of Sergeant Anderson's statements to the board and any derivatives of those statements. If there had been any, that would violate R.C.M. 706(c)(3)(B), (C), and (c)(5).

R.C.M. 706 is the rulemaker's effort to reconcile competing interests. Manual For Courts–Martial, United States, 1984 (hereafter MCM), Appendix 21, at p. A21–36 (analysis accompanying R.C.M. 706). On the one side is the need of a mental examination board to have full access to the accused's thoughts. On the other is the accused's interest in keeping those thoughts private and protecting them through his privilege not to give evidence against himself. *See generally United States v. Frederick,* 3 M.J. 230 (C.M.A. 1977); *United States v. Babbidge,* 18 U.S.C.M.A. 327, 40 C.M.R. 39 (1969). The rule resolves the conflict by extending a privilege against disclosure of the accused's statements and the report, thereby protecting the accused's admissions while still permitting the parties to have the benefit of the board's psychiatric conclusions.

The military judge accommodated Sergeant Anderson's motion to explore the matter, but he found no leaks, and neither do we. What is at stake is a privilege protected by Mil.R.Evid. 302. It provides that the remedy is to exclude evidence at trial. There is no appearance that any evidence obtained in violation of the privilege was ever offered, but, if it had been, there was no objection at trial, and so the matter is waived.[27] R.C.M. 905(b)(3), (e); Mil.R.Evid. 103(a)(1).

## C. Policeman's Opinion

During the trial the prosecution questioned a police detective about his opinion about the cause of an injury to the victim's neck. The defense objected that the policeman lacked the expertise to give such an opinion. The objection was overruled, and the policeman opined that the injury was caused by "[a] kick to the side of the neck."

█ The admissibility of such opinions is governed by Mil.R.Evid. 702, "Testimony by experts." It provides a "helpfulness" standard: If the evidence "will assist the trier of fact to understand," it is admissible. *Id.; see generally United States v. Banks,* 36 M.J. 150 (C.M.A.1992); *United States v. King,* 35 M.J. 337 (C.M.A.1992);

---

**27.** Our disposition of the legal issue in this case implies nothing about our view of the wisdom or prudence of the government's unnecessary brinkmanship. As the witness himself admitted, it is easily conceivable that his discussions with trial counsel might have revealed more than is permissible, though, luckily, they did not. Trial counsel took a great risk.

*United States v. Johnson,* 35 M.J. 17 (C.M.A.1992); *United States v. Gibson,* 24 M.J. 246 (C.M.A.1987); *United States v. Mustafa,* 22 M.J. 165 (C.M.A.1986), *cert. denied,* 479 U.S. 953, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986); *United States v. Sawyer,* 32 M.J. 917 (A.F.C.M.R.1991), *pet. denied,* 34 M.J. 75 (C.M.A.1991). The "expert" need not be a star in the field. *United States v. Stinson,* 34 M.J. 233 (C.M.A. 1992); *Mustafa,* 22 M.J. 165 (testimony by police investigator after 5–day course and several other cases about blood splatter patterns). It is enough that the expert has some specialized knowledge. *United States v. Carter,* 26 M.J. 428 (C.M.A.1988) (rape syndrome description). On appeal we review such rulings only for abuse of discretion. *Stinson,* 34 M.J. at 238; *United States v. Stark,* 30 M.J. 328, 330 (C.M.A. 1990); *Mustafa,* 22 M.J. at 168; *Sawyer,* 32 M.J. 917; *United States v. Rojas,* 15 M.J. 902, 924 (N.M.C.M.R.1983), *set aside on other grounds,* 17 M.J. 154 (C.M.A.1984) (collecting cases decided before the Military Rules of Evidence were promulgated). We find no abuse here, and no relief is warranted.

Even if the admission of the policeman's opinion had been error, we doubt that any relief would have been warranted. Elsewhere in the trial a forensic pathologist testified at length about all the victim's injuries, and he gave the same opinion about the cause of the injury to the neck. There was no objection to that testimony. Thus, the policeman's opinion was, if anything, cumulative of the pathologist's, and no prejudice could have resulted from it. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1988).

### D. The "Last Will"

We now reach what is likely the central issue in this appeal. We have mentioned that Sergeant Anderson suffered a car accident after the victim was killed. The operators of the tow truck that hauled away his car found and gave to police a document that the parties have come to call the "Last Will." It is a spiral-bound notebook including six double-spaced pages of hand-written lines that begin, "To whom it may concern." Those are followed by two pages of handwritten instructions for disposition of the author's effects. An expert identified the handwriting as that of Sergeant Anderson. The prosecution offered a masked version, but the defense objected that more needed to be masked and some that was masked needed to be unmasked. The military judge considered the matter and concluded that the document could not be masked in an acceptable way, so he admitted the entire document, with no masking.

■ The controversy focuses on the first six pages,[28] so we must summarize them. The author declared his love for his relatives. Then he described the misery of his life with his wife, despite his love for her. Most of the letter is about the wife's misconduct, but the author referred with increasing detail to two courts-martial. It becomes clear that the author held the wife responsible for his two prior convictions. Finally he wrote, "Black TSgt Anderson was brought to trial twice for 2 blows to his spouse.... Because [the victim wife] was never brought to trial I took it upon myself and found her guilty." Elsewhere he wrote, "I tried to have intercourse yet I could not because she disgusted me with her lying."

■ Trial defense counsel objected to "the whole document" as irrelevant and as uncharged misconduct, citing Mil.R.Evid. 403 and 404(b). If one parses the document sentence by sentence, some are clearly irrelevant, but few, and we find no fault with the military judge's decision that those few irrelevant passages did not need to be masked. Taken as a whole, the "Last Will" lays out the author's ill will toward

---

**28.** The two-page testament records that Sergeant Anderson intended to leave nothing to his wife and her family. Such a disposition of a married man's effects would supply some evidence that the husband harbored some ill will toward the wife and her family. Ill will was relevant in this trial to show motive and intent. While it would be unwise to draw any inferences from those two pages alone, they were still sufficiently probative that admitting them was no abuse of discretion. There was no error in admitting the two-page testament.

his wife by detailing the ways she did him wrong. That is, of course, the least difficult aspect of this issue.

By far the more difficult problem is the uncharged misconduct objection. There is clear authority in other custodial and restraint cases that evidence about the offense for which one has been confined is objectionable. *United States v. Mackie*, 16 U.S.C.M.A. 14, 36 C.M.R. 170, 172–73 (1966) (correctional custody); *United States v. Yerger*, 3 C.M.R. 22 (1952) (restriction adjudged by prior court-martial); *United States v. Ervin*, 5 C.M.R. 699, 702 (A.F.B.R.1952) (restriction). Perhaps for that reason, and to eliminate the defense concerns, the trial counsel offered a copy of the "Last Will" on which he had masked all that could have been objectionable except the "intercourse" passage. The defense did not retreat from its objection to the whole document, but it further objected to the prosecution's version as masking too much with the result that the pivotal "I found her guilty" sentence would then be misleading when deprived of its context. The military judge considered the problem carefully and decided to admit the whole document, unmasked. Though he clearly informed the record that he had applied the required balancing test, he did not explain the interests that he considered or how they seemed to him to balance. A trial judge's analysis of an offer of uncharged misconduct under Mil.R.Evid. 404(b) is likely the most complicated of the evidentiary decisions at trial. We now trace that course to dispose of this issue.

The judge must first determine what the offered misconduct is. In most cases that is readily apparent or ascertainable. In this case, one must parse the "Last Will." Having done so, we find in it the following two major points:

1. Sergeant Anderson had twice struck his wife in two separate episodes.

2. Sergeant Anderson had attempted intercourse with his wife, perhaps without her consent, and his statement leaves unclear whether he did so before the melee began, during it, or afterwards.

The parties have disputed whether the attempt at intercourse is misconduct at all. Trial counsel noted that rape of a spouse is no crime under either the UCMJ or Texas law, and the government adds on appeal that neither is necrophilia. This exploration of the legality of violent and bizarre sexual behavior is helpful, but it is not dispositive, for the uncharged misconduct rule is not limited to crimes but also includes evidence of other acts, apparently without regard to whether they were criminal or merely reprehensible. *Cf. United States v. Franklin*, 35 M.J. 311, 318 (C.M.A.1992) (prior act may not have been unlawful); *United States v. Lips*, 22 M.J. 679, 681 (A.F.C.M.R.1986), *pet. denied*, 24 M.J. 45 (1987) (prior act was lawful). We consider the statement to relate an attempt at misconduct, evidence which we assume to be governed by Mil.R.Evid. 404(b).

The next three steps are those now familiar, often attributed to *United States v. White*, 23 M.J. 84 (C.M.A.1986). First in the analysis is to determine for what purpose the evidence is offered. The trial counsel argued and the military judge found that the "Last Will" was probative of intent and motive, suggesting a premeditated plan to kill that arose because of and was motivated by the wife's infidelity and her failure to visit Sergeant Anderson in jail.

One must next determine whether the uncharged misconduct was similar or required to be similar to the charged offenses. Of course, the assaultive behavior, including nonconsensual intercourse, shares considerable similarity with the charged murder, but the similarity that is present may not be necessary, for there is a clear nexus between all the uncharged misconduct and the charged murder. The prior assaults on the wife were mere prologue to the final one, and they all display Sergeant Anderson's ill will toward her, a disposition that ultimately led him to kill her. The attempt at intercourse is the least logical part of the transaction, but the evidence that the victim was partially nude during the last assault yields the inference

that the "intercourse" statement referred to an event immediately before, during, or (given the other evidence) immediately after the beating and fatal wounds. We think there is enough nexus that there is no need for similarity, but if there is, it is satisfied.

We next address the relevance of the information. The surrounding proof showed the writing to have been by Sergeant Anderson, and his report that he had been twice convicted for striking his wife is conclusive on the fact of the convictions, and the convictions make it likely that he did do the deeds that he reported. Similarly, his "intercourse" statement reports his own attempt, and his word may be taken as conclusive on that subject, too. Thus, there is virtually no doubt of either the occurrence of the uncharged misconduct or of the identity of the perpetrator.

 Now we examine whether the evidence was offered for some purpose other than propensity. We are satisfied that there was indeed some tendency of the "Last Will" as a whole to establish Sergeant Anderson's motivation and his intent to kill, and his intent was in issue. Indeed, the ultimate defense strategy seems to have been aimed at avoiding or defeating proof of premeditation and intent to kill to limit any conviction to a non-capital offense, e.g., voluntary manslaughter in violation of Article 119, UCMJ, 10 U.S.C. § 919 (1988).

 Finally, we must consider whether the potential prejudice by admission of the evidence outweighed its probative value. The military judge enjoys wide discretion if he has balanced the two considerations. *See, e.g., United States v. Hebert,* 35 M.J. 266 (C.M.A.1992); *United States v. Spata,* 34 M.J. 284, 286 (C.M.A. 1992); *United States v. Mirandes–Gonzalez,* 26 M.J. 411, 414 (C.M.A.1988); *United States v. Hicks,* 24 M.J. 3 (C.M.A.1987), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 55 (1987); *White,* 23 M.J. at 88; *United States v. Brooks,* 22 M.J. 441 (C.M.A.1986); *United States v. Jones,* 25 M.J. 567 (A.F.C.M.R.1987). While this military judge did not explain his conclusion or record his analysis,[29] he did show that he was aware of the need to balance such considerations and declared that he had done so. That is enough. *United States v. Palmer,* 29 M.J. 929, 938–39 (A.F.C.M.R. 1989), *aff'd,* 33 M.J. 7 (C.M.A.1991) (not required to do it on the record). This is the most difficult and troubling step in this case, despite the latitude given to us by the generous standard for review. It is difficult because the military judge admitted the whole document instead of masking parts.[30] As a result, he admitted two very

---

**29.** Both we and the Court of Military Appeals have encouraged military judges to explain their balancing analysis on the record. *See, e.g., United States v. Jones,* 32 M.J. 155, 158 (C.M.A. 1991); *United States v. Dodson,* 21 M.J. 237, 239 (C.M.A.1986) (Everett, C.J., concurring); *United States v. Lips,* 22 M.J. 679, 682 (A.F.C.M.R.1986); *United States v. Holt,* 21 M.J. 946, 949 (A.F.C.M.R.1986). The benefits are obvious. Articulating the analysis affords one the opportunity to evaluate its reliability at the time, and it preserves for the benefit of appellate reviewers the logic of the judge on an especially sensitive and slippery matter, logic which, despite the scholarship of appeals judges, might not occur to them.

Even more important is that the deference afforded to trial decisions by the abuse standard depends on the confidence held by appellate reviewers in the rationality and deliberation expended on the problem at trial. Withholding the reasoning implies a certain arbitrariness and threatens that deference. We emphasize to all that, while today we do not irrevocably couple the abuse standard to the presence of articulated trial-level reasoning, that deference need not be permanent. *United States v. Cole,* 31 M.J. 270, 272 (C.M.A.1990) (Article 66 "neither stops [us] from applying an 'abuse of discretion' test nor requires such a test."); *see also United States v. Sloan,* 35 M.J. 4, 6–7 (C.M.A.1992) (convening authority must state reasons for denial of deferment of confinement so that the decision can be reviewed by abuse standard).

**30.** The military judge first found that it was impossible for the parties to agree to a redaction that would satisfy both. As our analysis shows, we do not regard that alone as a reason for admitting the whole document, and we note elsewhere that the "remainder" rule, Mil.R.Evid. 106, applies by its express terms to choices of a *party* to require the whole to be admitted when part has already been. The military judge regarded the document as being impossible to redact without leaving some confusion or possibility of misleading. We disagree. The two statements which have most concerned us here could have been redacted without such dangers.

dangerous statements: "TSgt Oscar Anderson, Jr., was brought to stand trial twice for 2 blows to his spouse ..." and the "intercourse" statement.

■ First we address the "intercourse" statement. We find it to have no probative value in the case at all, but it has the obviously prejudicial message that Sergeant Anderson was such a bad and violent man that he would attempt intercourse by force, perhaps even after the victim was dead or dying. It was unnecessary but dangerous, and it was an abuse of discretion to admit it. However, the statement was harmless, for it proved little more than was suggested by the state of the victim's attire when she was discovered. It is not quite accurate to say that it was cumulative, but it is so nearly cumulative that admitting it was harmless error. *Cf. United States v. Franklin,* 35 M.J. 311 (C.M.A. 1992) (prior abusive, combative sexual behavior with different victim should not have been admitted but was harmless); *United States v. Cordova,* 25 M.J. 12 (C.M.A.1987) (insensitive remarks about prior rapes should not have been admitted but was harmless); *United States v. Mann,* 26 M.J. 1 (C.M.A.1988), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988) (evidence of prior sexual abuse of different child should not have been admitted but the error was harmless). No relief is warranted. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1988).

■ Similarly, it was unnecessary to prove that Sergeant Anderson had previously struck the victim, and that was irrelevant. His prior convictions and consequent punishments supplied part of the motivation for the present crime—revenge and ill will—but proving prior *assaults* only showed violent character and a ballistic course of events that might have been predicted to end just as they did, the kind of "propensity" evidence that Mil.R.Evid. 403 and 404 are intended to exclude. *See Franklin,* 35 M.J. at 316–17. Whatever minimal relevance and probativeness that might have attended this statement was

overwhelmed by the potential for prejudice, and it was an abuse of discretion to admit it. Once again, however, we must examine the evidence in the context of the record to determine whether it was harmless.

Taken as a whole, the evidence established Sergeant Anderson's motives for an assault on his wife, his presence and opportunity to commit one, and further established that he did commit one. It further establishes furtive behavior and consciousness of guilt afterward. There is no doubt that his wife was killed after an assault. The admissible parts of the "Last Will" reveal more of the grounds—real and imagined—for Sergeant Anderson's ill will and desire for revenge. There is no doubt left by the admissible parts of the "Last Will" and the other evidence that Sergeant Anderson was the person who killed his wife, and that is the only substantial inference that might have been drawn from the inadmissible uncharged misconduct. Accordingly, the error was harmless, and no relief is warranted. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1988).

Unfortunately, that does not end the matter, for the military judge did not give the required limiting instruction on the use of the uncharged misconduct. The defense, unable to persuade the military judge to instruct according to its proposal, objected to the judge's proposal and asked that he give no instruction at all.

■ Long ago the fundamental principle was established that there is a *sua sponte* duty to instruct on uncharged misconduct. *United States v. Grunden,* 2 M.J. 116 (C.M.A.1977). However, qualifications came fairly soon thereafter, and it is now clear that the instruction is not always required *sua sponte, United States v. Thompson,* 30 M.J. 99, 101 (C.M.A.1990) (required on request); *United States v. Thomas,* 11 M.J. 388, 392 (C.M.A.1981) (requirement for instruction depends on nexus); *United States v. Fowler,* 9 M.J. 149, 150 (C.M.A.1980) (reviews development of *sua sponte* requirement in *Grunden;* not

---

However, it is not enough that we disagree, for we review the military judge's ruling on how

much to admit for an abuse of discretion, and we find none.

always required); *United States v. James*, 5 M.J. 382 (C.M.A.1978) (not required where uncharged event bore "immediate relation"), and that it may be waived when it is required, *United States v. Wray*, 9 M.J. 361, 362–63 (C.M.A.1980). *See United States v. Dagger*, 23 M.J. 594, 597–98 (A.F.C.M.R.1986), *pet. denied*, 25 M.J. 241 (C.M.A.1987).

▌ The lesson in *Thomas, Fowler,* and *James* helps here. No instruction is required here because the uncharged misconduct is "part of the chain of events that leads to the consummation of the crime charged" or is "part and parcel." That approach abates the need for any instruction about the "intercourse" statement. The statement, its context, and the state of the victim's attire all combine to show that, whatever they were, the attempts at intercourse occurred in the apartment and immediately before, during, or immediately after the melee. They were "part and parcel" of it, and no instruction was required. Accordingly, there was no error in granting the defense request not to instruct.

▌ As our prior discussion suggests, however, we take a different view of the prior assaults that had resulted in the two prior convictions. Those *assaults* were neither "part and parcel," "inextricably related" to the homicide, or even "part of the chain of events" that led to the victim's death. A limiting instruction was required. However, *Thomas* and *Wray* make it clear that the instruction can be waived even where it would otherwise be required sua sponte. The defense waived the instruction, and no relief is required.[31]

▌ We are still not finished with this issue. As has become increasingly the trend, appellate defense counsel seek to avoid the waiver by claiming it to have amounted to ineffective assistance of counsel. The Sixth Amendment bestows upon criminal defendants a right to the effective

assistance of counsel. *See generally Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Scott*, 24 M.J. 186 (C.M.A. 1987); *United States v. Barnard*, 32 M.J. 530 (A.F.C.M.R.1990), *pet. denied*, 33 M.J. 484 (C.M.A.1991). Reversal of a conviction for denial of such assistance requires that the appellant show that counsel's assistance was deficient and that the deficiency prejudiced the appellant. *Id.* There is no simple standard or checklist of factors for the examination of counsel's performance. Instead, one must determine whether the appellant received a fair trial, and whether counsel's performance was reasonable under the circumstances, with due deference. The range of acceptable performance is wide. *Strickland*, 466 U.S. at 688–91, 104 S.Ct. at 2064–66.

One of the lawyers who represented Sergeant Anderson replied to his arguments in an affidavit, as is typical. *See, e.g., United States v. Daffron*, 32 M.J. 912, 915–16 (A.F.C.M.R.1991), *pet. denied*, 34 M.J. 75 (C.M.A.1991). Appellant did not rebut it, and he has not submitted any evidence on his claims of ineffectiveness other than the record. Accordingly, we will rely on the affidavit as well as the record when examining this issue. *Id.*

Appellate defense counsel's arguments on this issue are particularly strenuous, emphasizing perhaps too much the evidentiary impact of the "Last Will." While it is true that it was powerful, nothing in the military judge's proposed instruction was likely to make it otherwise. Assuredly, the military judge intended to limit its uses to those permissible, but that remained devastating use, and nothing that the defense could have done would have reduced the "Last Will" to insignificance. As appellate counsel for the government put it, the trial defense counsel are not ineffective in the constitutional sense just because they cannot make a silk purse from a sow's ear.

---

**31.** For the sake of completeness, we also note that the waiver is not affected by any flaws in the instruction intended by the military judge. The instruction must identify the purpose for which the evidence has been admitted and bar its use for improper purposes, e.g., character or "propensity" inferences. It should be given upon admission and again before deliberation on findings. *United States v. Levitt*, 35 M.J. 114 (C.M.A.1992). The judge's instruction and his plan to give it met those tests.

Left with a choice between the theoretical value of a limiting instruction and the oft supposed disadvantage that such an instruction simply brings even more attention to the evidence, the defense chose to reduce the attention directed to the "Last Will" in the instructions. The defense counsel's explanations show that the choice was a considered tactical decision.[32] We do not second-guess such choices. Sergeant Anderson received much more than that quality of representation that is required to assure a fair trial and a reliable, adversarial process. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064; *United States v. Cronic*, 466 U.S. 648, 653–57, 104 S.Ct. 2039, 2043–46, 80 L.Ed.2d 657 (1984). Nothing more is required. No relief is warranted on this claim.

### E. The Witness' Second Statement

■■ The last important evidentiary matter arises because of the special privilege of the members of a court-martial to summon more evidence. *See* R.C.M. 913(c)(1)(F), 921(b). After having begun deliberations, the members asked to have a copy of the statement given to the police by the victim's child. They knew about the statement because the defense had cross-examined the child about it. She had not related in it that she had seen Sergeant Anderson take a large kitchen knife from under her mother's mattress. What the members did not know was that there were two such statements. The second statement was given the next day, obviously a follow-up to the first, and it included the part about the knife.

The defense had no objection to the first statement and even asked that it be labeled a defense exhibit, as it was. Sergeant Anderson stipulated to its authenticity. Predictably, the defense objected to the second statement. However, it stated no grounds other than that providing it exceeded the request of the members.

Equally predictably, the prosecution took a different view. It argued that the second statement was simply a continuation, amplification, or explanation of the first. The statement itself supports that view. Accordingly, the prosecution urged the military judge to view the two statements as effectively one. Though trial counsel never uttered the words, his position could have been based on Mil.R.Evid. 106, "... related writings ...," which seems to resolve this issue. It provides—

> When a ... statement ... is introduced by a party, an adverse party may require that party at that time to introduce ... any other ... statement which ought in fairness to be considered contemporaneously with it.

Mil.R.Evid. 106 was adopted verbatim from Fed.R.Evid. 106. MCM 1984, analysis at A22–4. What the drafters did not anticipate was that a third part of a military forum might be responsible for the "introduction" of evidence, namely the court-martial itself. Thus, we need only decide whether the court-martial is itself a "party" within the meaning of this rule.

Regrettably, we find no help in this decision except Mil.R.Evid. 102, the rule of construction which requires the rules of evidence to be "construed to secure fairness ... to the end that the truth may be ascertained and proceedings justly determined." In the setting of this case, we think that when the members summon more evidence, they must be regarded for this purpose as a "party." The prosecution's intent was simply to assure that the truth-seeking was not impeded by an inadvertently one-sided summons. Any other response to this situation would have been fatuous. We find no error.

### VII. The Findings

Sergeant Anderson asks us to review the conviction of murder for two reasons. First, he urges that the term "premeditation" is unconstitutionally vague, and, second, he urges that the evidence is insufficient to sustain the conviction of premeditated murder. We specified yet another

---

**32.** The defense counsel's affidavit is also particularly strident. It conveys the feeling of betrayal that is often inevitable when ineffectiveness is assigned. It is an example of the kind of dam-

age that this assignment does, the kind to which we referred in *United States v. Barnard*, 32 M.J. 530, 532 (A.F.C.M.R.1990), *pet. denied,* 33 M.J. 484 (C.M.A.1991).

such issue, whether the evidence was sufficient to sustain the conviction for escape from confinement.

### A. "Premeditation"

◼ At trial Sergeant Anderson's counsel moved for appropriate relief on the grounds that "premeditation under *Rule for Courts–Martial 1004* is unconstitutionally vague." (Emphasis added.) R.C.M. 1004 is about capital *sentencing* procedure and factors, not about the elements of proof. However, the defense argument on appeal cites cases about vague penal statutes, not about improper factors in capital sentencing. The military judge denied the motion. To the extent that Sergeant Anderson intended to complain that premeditation is too imprecise a term to filter capital cases from non-capital cases, *see United States v. Gay*, 16 M.J. 586, (A.F.C.M.R.1983), his complaint is moot, for he was not sentenced to death, and we do not address that aspect. However, generous treatment of his assignment suggests that he also contends that Article 118(1), 10 U.S.C. § 918(1), is unenforceable for vagueness because the term "premeditation" is vague. That assignment was addressed in *United States v. Mansfield*, 33 M.J. 972, 988–89 (A.F.C.M.R.1991), *pet. filed*, 36 M.J. 16 (C.M.A.1992). When, as here, a proper definition is supplied in the military judge's instructions, there is no ambiguity. *See* annotation, Lee R. Russ, *Modern Status of the Rules Requiring ... "Premeditation" as Elements of Murder ...*, 18 A.L.R.4th 961 (1982). This assignment is without merit.

### B. Escape

◼ One would have expected that Sergeant Anderson would have been prevented from committing murder while he was serving the confinement earlier adjudged, but he was a minimum custody prisoner, allowed to go about the base without escort and allowed to go off the base with an escort. He arranged a trip off the base and got an escort. The escort took him off the base to do his errands, which involved a stop at his wife's apartment, a trip to an auto dealer, and a return to the apartment. The escort twice left Sergeant Anderson at the apartment and finally went on his own way, leaving Sergeant Anderson unsupervised at the apartment, intending that Sergeant Anderson would return with his wife to the base and to confinement. Mrs. Anderson eventually returned to the apartment and told her daughter to dress so that Mrs. Anderson could take Sergeant Anderson back to the base. Afterwards she was killed, and Sergeant Anderson drove away from the apartment, dropped the child for safekeeping, and fled. On these facts he was convicted of an escape from confinement in violation of Article 95, UCMJ, 10 U.S.C. § 895 (1988).

The elements of an escape from confinement include that the prisoner "cast off" the physical restraint. *See* MCM, Part IV, paragraph 19c(4)(a) and (c) (1984). We have held in a similar case that, where the prisoner was left by the escort, there was no "casting off." *United States v. Standifer*, 35 M.J. 615 (A.F.C.M.R.1992). The prisoner in *Standifer*, unlike Sergeant Anderson, remained where he was supposed to stay, but in *United States v. Hunter*, 25 C.M.R. 568 (A.B.R.1958), the same element was found lacking where, as here, the escort abandoned the prisoner, when the prisoner was not then where he was supposed to be; was left with no instructions to stay, go, or return; and whose travels thereafter are not reported. Sergeant Anderson's case is similar. If there existed any of the physical restraint required in an escape from confinement,[33]

---

**33.** This theory for our disposition avoids any analysis of the extent to which the proof in this case showed the prisoner to be under "physical restraint," an issue the close kin of which recently divided this Court in *United States v. Felix*, 36 M.J. 903, 1993 WL 51365 (A.F.C.M.R. 1993). I noted then,

There is an oft-repeated doctrine that a prisoner remains in "physical restraint" even when outside the jail if accompanied by an escort who—even unarmed—has the means and duty to oppose flight. *See, e.g., United States v. Hodge*, 50 C.M.R. 445 (A.F.C.M.R. 1975). We have no fight to pick with the general idea that an escort can supply the physical restraint that is otherwise lacking outside a jailhouse, but, as one might expect, prior cases have offered many an opportunity

we find the evidence insufficient to prove the "casting off" that is also required. We set aside the conviction of escape, and we address the effect of the error in our treatment of the sentence.

### C. Sufficiency

"The test for [legal sufficiency] is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The test for factual sufficiency is "whether, [we] are [ourselves] convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. We have examined this record with special care, and the convictions for assault consummated by a battery and premeditated murder meet both tests.

> to find the limits of that doctrine. For example, in *United States v. Cornell*, 19 M.J. 735 (A.F.C.M.R.1984), our predecessors affirmed a conviction of escape from confinement where the prisoner—in minimum custody—was permitted *to go out of the jail unescorted* to a gym, from whence he fled without authority. *Cornell* was based on *United States v. Maslanich*, 13 M.J. 611 (A.F.C.M.R.1982), *pet. denied*, 14 M.J. 236 (C.M.A.1982), in which a panel of this Court explicitly overruled with only momentary analysis the precedent inconsistent with its view of the law relative to "physical restraint."
>
> One might well criticize *Cornell* and *Maslanich* as confusing the *status* of confinement with the *fact* of physical restraint, both of which appear to be required in an escape from confinement. That is exactly the flaw in the majority's approach in this case, explicitly stated in its opening. As the clarity of the distinction between the two has been reduced, we seem in *Cornell* to have gotten to the point that proof of one element (physical restraint) may be inferred from proof of the other (status of confinement), regardless whether the facts of the prisoner's life were congruent with that inference. To put it even more bluntly, *Cornell* and *Maslanich* lure one seductively into *assuming away* a distinct requirement for proof of "physical restraint." Such a flawed approach warrants reconsideration.
>
> *Felix*, 36 M.J. at 917 (A.F.C.M.R.1993). My dissenting brother, Senior Judge McLauthlin, was in the majority in *Felix* and now reiterates

### VIII. Sentencing

Sergeant Anderson assigned three errors relating to sentencing. He moved at trial for a separate "panel" on sentencing, but the motion was denied. That motion related to the possibility of a capital sentence. Since a non-capital sentence was adjudged, the matter is now moot, and we do not address it.[34] He also urges that the mandatory life sentence provision of Article 118 denied him due process. Finally, he urges that the sentence is too severe. After we address his assignments, we consider the effect on the sentence of setting aside the conviction for escape.

### A. Voting on a Mandatory Minimum Sentence

■ Sergeant Anderson points to the tangle of statutory requirements that arise in a case in which there is a mandatory minimum sentence and urges that he was denied the benefit of the voting contemplated by Article 52(b)(2), UCMJ, 10 U.S.C.

> its view. Senior Judge Leonard and I were in the minority in *Felix*, but our disposition of this case turns on an element of proof different from the one that divided the Court in *Felix*, and so we do not feel obliged to follow *Felix* (a correctional custody case about "physical restraint") into the present setting (an escape case about "castingoff"). As is plain from our dissent in *Felix*, we do not agree with Judge McLauthlin's view in this case. However, it restates the *Felix* problem, thus ironically inserting that issue in a confinement case, where it rightly belongs, and begging the Court of Military Appeals to decide, however belatedly, whether *Maslanich* and *Cornell* were jurisprudential disasters or triumphs of substance over procedure.

34. We do note, however, that courts-martial do not have "panels." Defense counsel's mistaken belief to the contrary accounts for his suggestion that it might be possible to have two or more sets of members to try different phases of a case. The members *are* the court-martial. They constitute it. Thus, to re-state the defense idea in correct terms, the defense asked to have the sentencing case tried by a different court-martial. That is a remarkable suggestion for which there is no military precedent except those instances caused by some form of remedial remand. The code provides no support for the idea. That, of course, says nothing about the constitutionality of the present system in capital cases, but that is an issue that must await a capital case for consideration with the benefit of much more thorough analysis.

§ 852(b)(2) (1988). As his brief discloses, Sergeant Anderson really asks us to follow a path different from that taken by the Court of Military Appeals in *United States v. Shroeder*, 27 M.J. 87 (1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). To induce us to do so, he brings to our attention a decision of a federal circuit court which he thinks did so, *Dodson v. Zelez*, 917 F.2d 1250, 1255–62 (10th Cir.1990). We may not ignore precedent of the Court of Military Appeals, *United States v. Jones*, 23 M.J. 301, 302 (C.M.A.1987), and that is what we would need to do to reach the result for which Sergeant Anderson argues. To the extent that *Dodson* might require a different result from *Shroeder*, we must follow *Shroeder*.

However, *Dodson* was different. It involved a soldier whose trial was in 1981, before the present, bifurcated procedure for capital sentencing. That procedure was not used in Sergeant Anderson's case because the findings were not unanimous, and that prevents a capital sentence. Neither Dodson nor the military judge at that court-martial were quite so fortunate. When Dodson's sentence was determined, death was still a possibility. The military judge in *Dodson* focused on life and death and composed an instruction that walked right into a voting trap. He told the members that if any member voted for confinement, the balloting could stop then and there, for death was thereafter excluded for lack of unanimity and the mandatory minimum life imprisonment would follow automatically.

The *Dodson* instruction had two flaws. First, it ignored the requirement that sentence proposals include any "accessory" punishments—reductions, forfeitures, et cetera—intended and be voted on as proposals. R.C.M. 1006(c) and accompanying discussion. The *Dodson* procedure allowed separate balloting on each kind of punishment. Second, that flaw and the premature abandonment of balloting on confinement subverted the requirement that three quarters of the members concur in any sentence including confinement for more than 10 years. The procedure in Sergeant Anderson's case was considerably different, and his case is not governed by *Dodson*.

The military judge instructed Sergeant Anderson's court-martial (1) about the maximum punishment; (2) that there was a minimum punishment, confinement for life; (3) that each member could propose a sentence; (4) that "each proposed sentence *in its entirety*" (emphasis ours) would be voted in order from least to most severe, R.C.M. 1006(d)(3)(A); (5) until the members arrived at the required concurrence of three quarters of the court-martial. Thus, in Sergeant Anderson's case the procedure required the concurrence specified by the code. No relief is warranted on this assignment. *Shroeder*, 27 M.J. 87.

### B. Reassessing Sentence

■ Because we have found the error discussed above and set aside the conviction for escape, we must reassess the sentence to assure that no greater sentence is approved than would have been adjudged at trial, had the error not occurred. *United States v. Peoples*, 29 M.J. 426 (C.M.A. 1990); *United States v. Sales*, 22 M.J. 305 (C.M.A.1986). *See generally, United States v. Waits*, 32 M.J. 274, 276–77 (C.M.A.1991). We are satisfied that we can do so. Considering only the evidence admitted at trial, we reassess the sentence and approve the sentence as adjudged. In short, we are convinced that the conviction for escape could have had no discernible effect on the sentence which would have been adjudged. The confinement was a mandatory minimum that resulted from the conviction for murder. A dishonorable discharge was appropriate in this case for the murder alone, as were the forfeitures and reduction in grade, and, given the violent murder, they were certain to be adjudged. An escape from confinement is, compared to the murder, a relatively minor offense, and it could not have had any real impact in sentencing.

### C. Severity

■ Sergeant Anderson also complains that the sentence is unduly severe. We

have examined the whole record, the convictions, and the sentence, giving due consideration to the characteristics of this offender and to the crimes of which he was convicted. *United States v. Healy*, 26 M.J. 394 (C.M.A.1988); *United States v. Wingart*, 27 M.J. 128 (C.M.A.1988); *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982); *United States v. Ciulla*, 29 M.J. 868 (A.F.C.M.R.1989), *aff'd*, 32 M.J. 186 (C.M.A.1991), *cert. denied*, — U.S. —, 112 S.Ct. 172, 116 L.Ed.2d 135 (1991). We note that the crimes in this case were brutal and final, and this court-martial was shown to have been the third in a series, all of which arose from Sergeant Anderson's relationship with his wife. A pathologist reported that the chest bone, through which one of the stab wounds passed, "is a particularly sensitive structure." The evidence shows the kinds of traumatic injuries consistent with a prolonged beating. The stab wounds opened internal cavities which filled with blood, and, if she remained conscious, the victim would have endured the sound of her last breaths gurgling in her own blood. Her child—aware of the fight—testified that she thought she heard someone call her name as Sergeant Anderson took the child from the apartment. She never saw her mother alive again. We are satisfied that the sentence is not inappropriate, as adjudged and as approved. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988).

The finding of guilty of the specification of Charge III (escape from confinement) and of Charge III are set aside and dismissed. The remaining findings and the sentence as reassessed are correct in law and fact, and they are—

AFFIRMED.

Senior Judge LEONARD concurs.

McLAUTHLIN, Senior Judge
(concurring in part and dissenting in part):

I am in substantial agreement with the lead opinion in all respects but one: I would affirm appellant's conviction of escape from confinement. The majority detects no "casting off" of any physical restraint in this case—I would find to the contrary. In *United States v. Maslanich*, 13 M.J. 611 (A.F.C.M.R.1982), *pet. denied*, 14 M.J. 236, and in *United States v. Cornell*, 19 M.J. 735 (A.F.C.M.R.1984), we concluded that a prisoner is "physically restrained" as long as that prisoner is in a lawful confinement *status*. Clearly, this status continues when the prisoner is outside the jailhouse and even when the prisoner is then left alone. According to the Manual's discussion of the offense, "Confinement *is* physical restraint imposed under R.C.M. 305, 1101, or paragraph 5b, Part V." (Emphasis added) MCM, Part IV, paragraph 19c(4)(a). The Manual also notes that the "lack of effectiveness of the restraint imposed is immaterial." MCM, Part IV, paragraph 19c(4)(c).

In *Maslanich*, we found an escape from confinement when an unattended prisoner walked out of his defense counsel's office and left the base. Similarly, in *Cornell*, we affirmed the escape from confinement conviction of an unescorted prisoner who departed the confinement facility with permission to go to the gymnasium, but exited the base instead. *Maslanich* is the sole case cited in the Manual's analysis of the "escape" element of this offense. MCM, App. 21, paragraph 19c(4)(c).

Under the majority's rationale, an escape from confinement is conditioned upon the quality of the confinement facility or the attentiveness of the escort. This approach illogically labels the fleeing prisoner an escapee if guarded, but innocent if not. In my view, however, "restraint of physical liberty is intrinsic in the status of confinement," *Cornell*, 19 M.J. at 736, and *any* prisoner who throws off that status has escaped confinement in violation of Article 95, UCMJ.